## Case No. 8,426.

### The L. J. FARWELL.

[8 Biss. 61; [1] 10 Chi. Leg. News. 9.]

District Court, E. D. Wisconsin. Sept., 1877.[2]

BILL OF LADING — ISSUED BEFORE GOODS DELIVERED—EFFECT OF SUBSEQUENT DELIVERY—ESTOPPEL—POWER OF MASTER.

1. If a master of a vessel signs bills of lading before the goods are on board, and afterwards they are placed on board as and for the goods embraced in the bills of lading. the bills operate on the goods as against the shipper and master, by way of relation and estoppel.

2. The master of a vessel delivered to D. a bill of lading for 8,000 bushels No. 1 wheat. Five days later he delivered to D. a second bill of lading for 8,300 bushels No. 1 wheat, but consigned to a different party. No wheat was at the time on board. D. attached the bills of lading to drafts drawn on the respective consignees which were duly paid. Subsequently 9,300 bushels of wheat were placed on board. when D. failed and could deliver no more. There was no designation by the shipper of any portion of the wheat as intended to fill either bill, it being his intention

to fill both. On demand by the holders of the bill prior in time. the master delivered the amount called for in that bill: Held, that both bills became concurrently operative as the wheat was placed on board, and that in the absence of any appropriation by the shipper of any portion of the wheat to either bill, the holders of the bills became tenants in common and entitled to pro rata shares of the wheat actually delivered: Held, further, that the master could not on receiving the wheat on board. appropriate it to either bill, so as to bind the parties, and he having delivered the full 8,000 bushels to the holders of the bill prior in date, the vessel became liable to the holders of the second bill for the value of the pro rata quantity of wheat called for by their bill.

This was a libel filed against the schooner L. J. Farwell, to enforce a certain demand in favor of E. J. Burkam & Co., the libellants, arising upon the following state of facts: In August, 1874, George B. Dickinson was a forwarding and commission merchant at Detroit. Dennis Driscoll was master of the schooner Farwell, which on the 26th of August was lying at that port. On that day the master signed and delivered to Dickinson a bill of lading for 8,000 bushels of No. 1 wheat, consigned to Reed & Co., of New York. On the 31st day of the same month, the master signed and delivered to Dickinson another bill of lading for 8,300 bushels of No. 1 wheat, consigned to libellants. Drafts were drawn by Dickinson against both bills upon the parties to whom the wheat mentioned in the respective bills, was consigned, which drafts were duly paid on presentation.

At the time the bills of lading were delivered to Dickinson there was no wheat on board the vessel, of which fact the consignees, Reed & Co. and Burkam & Co., had no knowledge when they paid the drafts drawn upon them by Dickinson. No wheat was delivered on board the vessel until the 2d of September, when Dickinson began loading the vessel, intending to put wheat enough on board to fill both bills of lading. About 9,300 bushels were placed on board when Dickinson failed, and was unable to deliver any more wheat to the vessel. The captain testified that the vessel was chartered by Dickinson to carry 16,300 bushels of wheat to Buffalo, and that he put a bulkhead in the hold of the vessel before any wheat was delivered, intending to place the 8,000 bushels consigned to Reed & Co. aft the bulkhead, and the 8,300 bushels consigned to Burkam & Co. forward, thus keeping the two consignments separate. But he further stated that he did not wish to be understood as meaning that Dickinson told him that the first 8,000 bushels placed on board were for Reed & Co.; and the testimony disclosed that after putting 5,000 or 6,000 bushels aft the bulkhead, the remainder of the 9,300 bushels delivered, was placed forward, and if there was any purpose originally to keep the two consignments separate, it was abandoned. The bills of lading called for wheat of the same grade, and there was, in fact, to the extent that

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

2 [Affirmed by the circuit court; case unreported.]

wheat was delivered, no separation of the same, for the purpose of distinct application on the respective bills.

When the two bills of lading were signed and delivered, it was the intention and expectation of both the shipper and the master, that the entire quantity of wheat called for by the bills, would be delivered on board and shipped, and the shipper, Dickinson, gave no directions for the application of wheat on one bill or the other, or for the apportionment of wheat to either bill.

The vessel did not leave Detroit, but on or about September 11th she was unloaded, and on demand of Reed & Co., and on receiving a bond of indemnity, the master delivered to them 8,000 bushels of the wheat, which was the quantity named in their bill of lading. Elevator receipts for the remainder of the wheat—between 1,300 and 1,400 bushels— were tendered to libellants, to apply on the bill in their favor on their giving a bond of indemnity, which tender was declined.

Finches, Lynde & Miller, for libellants.
Pond & Brown and Markham & Markham, for respondents.

DYER, District Judge. It is claimed by the libellants that the wheat should have been delivered to the respective consignees, each receiving such share of the whole as should be in proper proportion to the quantity of wheat called for by his bill of lading; that the libellants were entitled to 4,736 bushels; that the vessel is liable for non-delivery of the same, and that the libellants are entitled to a decree for the value of the wheat put on board as and for the wheat embraced in libellants' bill of lading, which, it is claimed, has been converted by the master and owners of the vessel. The question for determination involves, therefore, the ownership of this wheat under these two bills of lading.

The act of the master in signing and delivering the bills of lading in question, when there was no wheat on board the vessel, was unauthorized and irregular. A bill of lading is a contract by which the master engages to carry and deliver goods to the consignee, or to the order of the shipper. It acknowledges the goods to be on board, and they should be on board before the bill is signed. If, therefore, a master signs bills of lading before the goods are on board, or delivered to some one authorized to receive them, and they are never shipped, as the act of the master is not within the scope of his authority, the owners of the vessel are not estopped from showing the facts in a suit brought against them for non-delivery, by a bona fide indorsee of the bill of lading. In such case the owners are not liable. 1 Pars. Shipp. & Adm. 187, note; The Freeman v. Buckingham, 18 How. [59 U. S.] 191.

If, however, the bill is signed before the goods are on board, but upon the faith and assurance that they are to be delivered, and afterward they are delivered as and for the goods embraced in the bill of lading, as against the shipper and master the bill operates on the goods by way of relation and estoppel. This being so, the bill of lading then represents the property as effectually as if the execution of the bill and the delivery of the goods on board had been concurrent; and any bona fide holder for valuable consideration, who, by transmission to him or negotiation, has obtained such bill of lading, gets as valid and effectual a title to the goods so placed on board as could be acquired by an actual delivery of the goods themselves. Rowley v. Bigelow, 12 Pick. 314; Halliday v. Hamilton, 11 Wall. [78 U. S.] 560.

Another general principle may be here stated, namely, that priority of lien or of title does not depend upon the mere priority of signing either bill of lading. It is the shipment which gives the lien; the delivery of the property on board with notice to the party, which fixes the right and vests the property. Stevens v. Boston & W. R. Co., 8 Gray, 265.

As fundamental propositions, then, to aid us in settling the rights of these parties, it may be stated that, although there was no wheat on board this vessel when these bills of lading were issued, if subsequently wheat to the extent of 9,300 bushels was placed on board as and for a portion of the grain embraced in the bills of lading, as against both Dickinson and Driscoll, the bills of lading became operative to cover the property by way of estoppel, and in such proportions with reference to each holder of a bill of lading, as, upon a correct application of the facts and law of the case, may be established; further, that the priority in date of the bill of lading held by Reed & Co., does not alone fix their right or title to any particular proportion of the wheat.

The lien or title, if any, of both Reed & Co. and the libellants, as we have seen, springs from the shipment—the delivery of the property on board.

Now, had the bills of lading called for different kinds of wheat, and if such different kinds had been put on board, the appropriation to each bill of the kind of wheat called for, would seem clearly consistent with the rights of each holder of such bill of lading. So, too, if the master had received on board 8,000 bushels of wheat, and then given to the shipper a bill of lading therefor, and afterward had issued another bill of lading for 8,300 bushels, and had then received but 1,400 bushels, there would be no difficulty in appropriating the 8,000 bushels to the first bill of lading. In these cases it would be apparent that the bills of lading covered specific wheat, and such appropriations would accord with the evident intentions of the parties as manifested by their acts.

But in the present case there was no wheat on board the vessel when either bill of lading

was issued. After both were issued, the shipper commenced delivering the wheat to the vessel, intending to fill both bills. Undoubtedly Dickinson could have controlled and directed the application of the wheat on either bill, and his direction in that respect might have been conclusive. But he made no such direction, and so far as his intentions were concerned, he delivered the wheat as much for one bill as the other, since it was his expectation to place on board the full amount of both consignments. He had it in his power to deliver first the wheat to fill the second bill, and could have refused to deliver any upon the first bill, and in that case the holder of the bill posterior in date would have taken his full quantum of grain. But there was no designation or appropriation by the shipper.

This being so, could the master, after receiving the wheat on board, appropriate it to such bill of lading as he chose, and bind the parties? After much deliberation upon this point, I am convinced he could not, and will presently state reasons for that opinion. Then, if there was no specific appropriation of the wheat on either bill by the shipper, and if there could be none by the master, how, according to legal principles, must it be appropriated?

As no wheat was placed on board until after both bills of lading were issued, and as there was no designation by the shipper, of specific wheat for either bill, but an intention on his part to deliver the entire cargo according to the charter, both bills, although bearing different dates, became concurrently operative; that is, both became effectual to cover their proportionate shares of the wheat delivered, as the wheat was placed on board. Without regard to the dates of the bills of lading, from the time the wheat delivered on both bills was in the custody of the vessel, the legal relations of Reed & Co. and of the libellants were fixed. As soon as the wheat was deposited with the carrier, the title to it and right of property in it, was vested in those parties. Their bills of lading called for wheat of the same grade; the property was mixed and could not be distinguished, and there was not sufficient to satisfy the demands of both.

They stood, then, in the position of tenants in common, and determining their rights accordingly, each was entitled to wheat from the common mass in proportion to the amount called for by his bill of lading, and it was the duty of the master so to deliver it. In my judgment this conclusion is not to be avoided, if it be conceded that the wheat was put on board as and for the wheat covered by both bills of lading. And I think the proofs show that the shipper placed the wheat on board as a part of the 16,300 bushels embraced in both bills, and as both bills became concurrently operative to pass the title to the wheat, the holders of the bills of lading took title in common.

But it has been ably contended by the learned counsel for respondent that the master was justified in delivering the 8,000 bushels of wheat to Reed & Co. because their bill of lading was prior in date, and should first be made good from the wheat first delivered; further, that up to the time any wheat actually went on board, the transaction between the shipper and the master was purely personal; that the master was personally liable to the parties to whom the bills of lading were transmitted, and who paid drafts on the faith of them; that, therefore, in the absence of any appropriation of the wheat by the shipper, the master had the legal right to cancel his liability to either party on the bill of lading held by such party, by delivery of wheat sufficient to fill that bill, and stand personally responsible to the party holding the other bill; finally, that upon the bills of lading being issued, Dickinson stood in the relation of debtor to Driscoll, and that when wheat was delivered without specific appropriation by the former on either bill, the master, as his creditor, had the right to apply it according to the doctrine of appropriation-payments.

Upon the first point taken I have already sufficiently stated my judgment. As no wheat was delivered until after the issuance of both bills, and as it was the intention of the shipper to satisfy one bill as much as the other by delivery of wheat for both, and as the bills became operative only when wheat was deposited on the vessel, I am unable to see how priority in date of their bill gave Reed & Co. priority of right.

Had the master a right to so appropriate the wheat as to fully satisfy one bill of lading to the exclusion of the other? It is true, as already stated, that his action in signing the bills of lading before any wheat was delivered was irregular, and it may be admitted that he thereby incurred a personal liability to the holders of the bills. But when wheat was delivered by the shipper and was deposited on the vessel to meet the bills, certain relations sprang up between the consignees and the property. Certain rights in favor of the holders of the bills, and certain obligations on the part of the carrier, then became established, which could not be divested by any personal act of the master. The moment he began to receive grain on board to cover the bills of lading he began to act, not for himself alone, but as the agent of the vessel. The error of the position here urged arises from ignoring the legal relations to the property of Reed & Co. and Burkam & Co., which were created and fixed by the delivery on board the vessel for shipment, of wheat called for by the bills of lading. The argument on this point proceeds upon the theory that the master became personally liable to the holders of the bills of lading: that Dickinson became his debtor, and that in partial satisfaction of the debt Dickinson delivered to him this wheat, which

the master personally had the right to appropriate in payment of any part of his indebtedness created by the bills of lading. But the argument fails when we consider that the wheat was delivered on board the vessel; that in receiving it the master acted as the vessel's agent, and that, by established principles of law, when the wheat passed into the custody of the vessel, a right of property vested in the consignee, which could be no more affected by the personal act of the master than by that of any other person. And this is entirely consistent with the proposition that, as to all wheat called for by the bills of lading and not delivered on board the vessel, Dickinson and Driscoll, and not the vessel or its owners, are alone liable. It by no means follows that because originally, and before any wheat was placed on the vessel, the master may have incurred a personal liability by signing the bills of lading, he had the right to appropriate on either bill, as he saw fit, the wheat actually delivered on board.

It is further insisted that the master had the same right to appropriate the wheat to the bill of lading earliest in date, as a creditor has to apply moneys paid to him by his debtor upon promissory notes when the payment is generally by the debtor, and the demands are various in date. In other words, the doctrine of appropriation of payments is invoked, which is, that where a debtor owes his creditor on distinct accounts, he may direct his payment to be applied to either demand. If he makes no appropriation, the creditor may apply the money as he pleases. If no specific application is made by either party, the law will appropriate it as the justice and equity of the case may require.

I do not think this rule can be successfully invoked so as to give to the master the right to appropriate the wheat upon either bill of lading as he should choose. In the case of application of payments under the rule stated, no other party than the debtor and creditor are interested. The money paid by the debtor becomes the money of the creditor in his personal right, and the interests or rights of third parties are not involved. The views already expressed touching the rights of the holders of these bills of lading, and their relations to the property, afford a further answer to the particular point under consideration, and need not be repeated. In analogy to the present case, counsel suggested that if a vessel were chartered to carry wheat to one party, lumber to another, and shingles to still another, and bills of lading were accordingly issued before any part of the cargo was placed on board, and subsequently only wheat and a portion of the lumber were delivered, the party whose bill was not filled would not be heard to demand a pro rata share of the value of that part of the cargo delivered. The analogy fails, because in the case supposed the bills of lading would be issued for and on account of specific and dissimilar kinds of property. The consignee of lumber would have no right to call for wheat, and the holder of a bill of lading for shingles could not demand any other property than such as his bill specified. The bills of lading held by Reed & Co. and Burkam & Co. called for No. 1 wheat. With no specific designation of any particular portion to apply on either bill by the shipper, either expressed or to be inferred from the character of the property, the delivery of any part of the cargo would satisfy the terms of either bill of lading, and give to the consignees what they were entitled to.

It is said that the libellants cannot have a decree because they have failed to show ownership of any part of the wheat placed on board the vessel, and that the burden of proof is upon them to establish such ownership. The answer to this proposition involves a repetition of what has been already stated as to the effect to be given to the bills of lading, and the time when they became operative to vest the property in the holders of the bills. When the wheat was placed on board, these bills of lading represented that property, and the title to the wheat was changed and vested in the parties to whom it was to be delivered. Halliday v. Hamilton, 11 Wall. [78 U. S.] 564. To the extent that libellant's bill of lading represented the wheat on board, they became vested with title and ownership.

[The questions presented in this case are of unusual interest, and. it must be conceded, are not free from difficulty. Upon considering those questions with as much reflection and care as I have been able, in connection with other duties, to bestow upon them, I have been brought to the conclusion that the libellants should have a decree. And this conclusion seems in consonance with equity.] [3]

Let a decree be entered in favor of libellants for the value of their proportionate share of the wheat delivered to the vessel as prayed in the libel.

NOTE. On appeal, this judgment of the district court was affirmed by Mr. Justice Harlan. A bill of lading is as between the original parties in the nature of a receipt, and is open to explanation. The respondents are not estopped from setting up a mistake, and that the property receipted for was not all delivered to them; and where they have shown that the whole of a cargo of wheat received by them was actually delivered to the consignee, they are not liable for a deficiency from the amount receipted for in the bill of lading. The J. W. Brown [Case No. 7,590]. The master of a vessel has no authority from the owners to sign bills of lading in blank, and a bill of lading so signed is not valid against the owners, even in the hands of bona fide holders. The Joseph Grant [Id. 7,538]. Where two bills of lading describing the cargo shipped were made out in full, one of which was signed by the master, and the other by the shipper, and a third one was signed in blank by the master and left with the shipper, who, after departure of the vessel, filled up the blank bill with a change of consignee, and transferred it to a bank as collateral

---

[3] [From 10 Chi. Leg. News, 9.]

security for advances for the owners of the cargo, no maritime contract was thereby created between the bank and the vessel, without notice to the master, before delivery of the cargo according to the first bill of lading sent with the vessel. Id. Although as a receipt a bill of lading is subject to explanation, and can be affected by parol proof, yet. in so far as it is a contract. this rule does not apply. The Wellington [Id. 17,384].