ROBINSON and others *v.* MEMPHIS & C. R. Co.

*(Circuit Court, W. D. Tennessee.* April 24, 1883.)

1. COMMON CARRIER—BILL OF LADING—ISSUED WITHOUT DELIVERY OF GOODS.

The agent of a common carrier has no authority to issue a bill of lading unless the goods are delivered.

2. SAME SUBJECT—RIGHT OF ASSIGNEE OF BILL OF LADING TO SUE IN HIS OWN NAME.

Under the Tennessee Code the assignee of a bill of lading may sue in his own name.

3. SAME SUBJECT—SUBSEQUENT DELIVERY OF GOODS.

Where an agent of the carrier issues a bill of lading without the goods in hand, if they be subsequently delivered the contract takes effect and the carrier is bound as if the goods had been originally delivered.

4. SAME SUBJECT—SEIZURE OF GOODS UNDER LEGAL PROCESS—CARRIER'S DUTY—NOTICE TO CONSIGNEE—LIABILITY FOR FAILURE TO GIVE NOTICE—EXCUSE FOR NON-DELIVERY—JUS TERTII.

However the law may be elsewhere, the rule of the supreme court of the United States is that a seizure under legal process is a defense to the carrier in an action for non-delivery. But the mere seizure under valid process is not enough to excuse the carrier, for he must give immediate notice to the consignee; failing this, he becomes liable as in any other case of delivery to another person than his own bailee and assumes the burden of showing that the party seizing the goods under the process has the paramount title, unless he can show that the consignee had actual knowledge from other sources in due time to be equivalent to that notice he would have received if the carrier had not been negligent in this regard.

5. SAME SUBJECT — COLLUSION BETWEEN CARRIER AND THE ADVERSE CLAIMANT.

If the carrier, on demand of an adverse claimant to surrender possession, refuses, but promises to and does delay shipment so as to give the claimant an opportunity to sue out a writ of replevin or take legal proceedings, he is liable absolutely to the consignee unless he can show that the adverse claimant was the rightful owner; and this, whether he gives his bailee for carriage notice of the seizure or not. A carrier cannot thus desert his duty of immediate shipment and delivery according to his contract.

6. Same Subject—Case in Judgment.

Where 27 bales of cotton were received, to be delivered in New York to consignees mentioned in the bill of lading, who had advanced money on the faith of it, and the shipper sought to divert the cotton, after delivery to the carrier, by an order on the carrier to surrender it to a bank with which he had overdrawn his account, and which he desired to protect, and the agent of the common carrier agreed to comply with the order, but subsequently declined, and agreed to hold the cotton until legal proceedings could be taken, which was accordingly done, and the cotton seized in replevin at the suit of the bank, and there was no proof of any notice to the consignees or knowledge by them for several months after the transaction, *held*, that the carrier was liable for the value of the cotton, and the seizure under the process was no excuse for nondelivery according to the bill of lading, although it appeared that long after the seizure, but while the suit was still pending, the consignee had become a party defendant to the replevin suit.

Motion for New Trial.

This is the same case reported, as to the facts relating to the issuance of the bill of lading, in 9 Fed. Rep. 129, and those facts are omitted here. On the trial it was proved that Chiles had on hand at the time the bill of lading was issued, five or seven bales of cotton, marked as described in the plaintiff's bill of lading, and already in the hands of the railroad agents; that subsequently and prior to the first of July he sent from time to time to the agents at the depot 21 or more bales, making in all 27 bales; that from their mode of doing business with Chiles and other brokers, this cotton was understood by the agents to be delivered for account of plaintiff's bill of lading, to be held until the complement called for by the bill of lading was received, and then shipped. Chiles had absconded, and the defendant sought to prove by circumstances, not necessary to detail here, that he understood that he still had control of the cotton, and might change his orders until final closing by shipment; while the plaintiffs sought to prove by the direct testimony of the agents of the railroad, other brokers, and detailed circumstances, that Chiles understood the cotton to be delivered for account of plaintiffs' bill of lading. The mode of doing business between the railroad company and the cotton shippers generally, at that time and place, and particularly with Chiles, and especially with reference to this transaction, was fully proved, and on the testimony the jury found that the cotton had been delivered to account of plaintiffs' bill of lading, as the carrier's agents understood it to be.

It was further proved that at this place and time it was the invariable custom of the cotton shippers to take out bills of lading, as the plaintiffs' was taken out when no cotton was on hand; that these bills would be attached to drafts, as plaintiffs' was, and negotiated

with the local banks, and with funds so supplied the cotton brokers would proceed to buy, deliver, and complete the shipment in the method above stated; and that this continued successively, and with numerous bills of lading and various brokers throughout the cotton season.

It was also proven that on July 1, 1879, Chiles, being overdrawn at the Bank of Madison, with which he did his business, and with which he had negotiated plaintiffs' bill of lading,—the draft thereto attached for value of 32 bales of cotton having been paid by plaintiffs,—drew another draft on plaintiffs for the value of 42 bales of cotton, described in the bill of lading as marked "J. E. T.," which, with the bill of lading attached, was also negotiated by said bank, and the proceeds passed to Chiles' account, leaving him a small balance to his credit. The bank had enveloped the draft and bill of lading attached, to be sent by mail to its correspondent, to be presented to plaintiffs for payment, as Chiles' other drafts had been during the season, then about closed for cotton shipments; on the second day of July, before the letter was mailed, the railroad agent went to the bank and advised it that Chiles had no cotton on hand to meet this new bill of lading, nor fully to meet the former bill held by plaintiffs, and requested that the bill of lading be not forwarded to New York, and it was withheld and negotiations commenced immediately for a settlement with Chiles, who took up the bill of lading of the day before, marked "J. E. T.," and procured another from the railroad agent calling for cotton marked "W. W.," as in plaintiffs' bill of lading; he then gave the bank an order to the railroad agents for the cotton, claiming that he still had control over it.

The evidence offered by the defendant tended to show that, in interviews among all the persons concerned, including attorneys, there was an agreement by the railroad agents to surrender the cotton to the bank,—and a constructive surrender; but the testimony offered by the plaintiffs—the witnesses being the railroad agents themselves—tended to show that the agents did not yield to these importunities, and were misunderstood on that point; and there was no dispute that they did ultimately refuse to surrender the cotton to the bank, but promised to hold it until legal proceedings could be commenced. The bank on July 5, 1879, sued out a writ of replevin, under which the cotton was seized and delivered to the bank, and in which the railroad agents personally were named as defendants, the affidavits alleging that the cotton belonged to the bank and was wrongfully detained by them. The bank gave bond, as required by law, payable to

these agents as defendants in the replevin suit, in double the value of the cotton, to indemnify them against the wrongful suing out of the writ; but at the first term of the court the railroad company was, on its own motion, substituted under the statute as defendant. On March 11, 1880, the plaintiffs brought this suit against the railroad company, and in October, 1881, after the decision on the demurrer, they appeared in the state court, and on their motion were, under the statute, admitted as co-defendants in the replevin suit, which is still pending and undetermined.

The record of the replevin suit was read in evidence by the railroad company. There was no proof offered of any notice to the plaintiff of the seizure of the cotton at any time by the defendant. The verdict of the jury was for the value of the 27 bales of cotton and interest, and the defendant moved for a new trial.

*H. W. McCorry* and *J. W. Buford*, for plaintiffs.

*A. W. Campbell* and *Humes & Poston*, for defendant.

HAMMOND, J. The judgment of this court upon the demurrer to the defendant's pleas having been recently confirmed by an opinion of the supreme court, the further consideration of the questions raised by the demurrer becomes unnecessary, except that made in regard to the right of an assignee of a bill of lading to sue in his own name; and as to that, upon a reconsideration, in the light of the argument on the motion for a new trial, the court is satisfied with the opinion then expressed. *Pollard* v. *Vinton*, 105 U. S. 7; *Robinson* v. *Memphis & C. R. Co.* 9 FED. REP. 129; *Forbes* v. *Boston, etc.*, 26 Alb. Law J. 457. And it seems to me that the case of *The Idaho*, 93 U. S. 575, is equally conclusive of the question, so much argued at the trial and on this motion, about the subsequent delivery of the cotton. The facts as to this feature of that case were almost precisely like those here, and the decision there disposes of the argument that the bill of lading in this case was *void*, and being a nullity, could not by subsequent delivery be validated.

The argument made on this point is a misapprehension of the principle of *Pollard* v. *Vinton*, *supra*, applied by this court in the judgment on the demurrer. Because the carrier is not bound by a bill of lading issued by an agent, unless the goods are on hand and delivered for shipment, it does not follow that the principal is not bound by the bill of lading if the goods be in fact subsequently delivered to be transported according to the terms of the contract. There is no element of illegality or any such vice in the contract that it is *void* or incapable of confirmation by acts of the parties taken for that.

purpose; and the old bill of lading is as good as a new one issued on delivery of the goods if the parties choose to make it so. It is a question of fact in each case, and that issue was fairly submitted to the jury here, and the court is well satisfied with the verdict that the cotton was delivered by Chiles under the bill of lading held by plaintiffs. The jury was distinctly told that Chiles could do with his cotton as he chose, deliver it to the carrier for the plaintiffs or for any other consignee he might name, but having delivered it for one he could not afterwards divert the cotton and deliver it to another; and it was so decided in *The Idaho, supra.*

The remaining ground for this motion is that based on the replevin proceedings. Whatever limitations may be found in the law of bailment, as applied to common carriers, in relation to the right of the bailee to set up the *jus tertii* as an excuse for non-delivery, according to the terms of the bill of lading, this court is, it seems to me, precluded by the decisions of the supreme court from applying the doctrine—so much urged by counsel for the plaintiffs—that the carrier is held to an extraordinary responsibility arising from public policy or growing out of the terms of his contract, where, having an opportunity to insert all reasonable exceptions, he makes only such as provide against loss by "the act of God or the public enemy;" and that at most, in any case he takes always the peril of sustaining the title of the adverse claimant to whom he delivers, whether voluntarily on the simple demand of the claimant, or by compulsion of legal process at his suit. It seems to be quite universally conceded that the carrier may deliver to the *true owner*, but the precise consequences to the carrier of his delivery, through compulsion of legal process, to the *wrongful claimant*, when a controversy arises as to ownership, are by no means settled. Where the rightful owner is the consignee, as the verdict has satisfactorily established in this case, authorities may be found that hold the carrier to delivery, or to damages for non-delivery, at all hazards, unless the excuse falls within the specific exceptions in the contract of carriage itself; and compulsion of legal process is not one of these in the general form of bills of lading like that in this case; but if the process be against the consignee at the suit of some one claiming the consignee's own title by operation of law or otherwise, the delivery to such a claimant may be regarded as a delivery to the consignee himself, and a substantial compliance with the terms of the carrier's contract, and no reliance on the exceptions ordinarily found in a bill of lading is necessary. But even here the ques-

tion whether the carrier assumes the burden of establishing the validity of the claimant's right or title arises, and does not seem to be satisfactorily settled by the cases. But where the wrongful adverse claimant founds his demand for delivery to himself on some right independent of the consignee, and in no respect through him, as in this case, there is more reason in holding the carrier to an absolute responsibility; or, as some of the authorities put it, the carrier delivers at his peril to such a claimant, however it may be as to other bailees; or as between a carrier and other classes of claimants; and this whether the demand for delivery comes in the form of legal process or otherwise, except where the process is against the consignee himself, and here again the carrier's duty to the consignee and property may depend on whether the suit be at the residence of the consignee, and against him personally, or in some distant place without personal service; in which last case the carrier should do his utmost to protect the absent owner.

A little discriminating reflection and a comparison of the authorities will show that much remains for adjudication in the law of common carriers before the complications of this subject of delivery to a wrongful claimant under compulsion of legal process can be said to have been removed. The above distinctions, and others that might be suggested, show the scope of inquiry into the legal principles involved, and it is absolutely necessary to keep them in mind in properly dealing with any case.

The case of *The Idaho, supra,* settles that a carrier, like other bailees, may set up the *jus tertii;* and, however the law may be elsewhere, I feel constrained, by the case of *Stiles* v. *Davis,* 1 Black, 101, to hold to the broad principle that valid legal process from a court, to which the carrier is subject, demanding *the possession* of the goods, is an excuse for non-delivery. It is the *vis major* of the law, and that public policy which demands obedience to the process of the courts overrides that other policy which requires the carrier to perform his contract under a very rigid responsibility of strict construction and guarantied performance. And this protection is afforded, whatever the form of action for non-delivery against the carrier may be, if by the process the goods are taken from him, as in this action of replevin. The carrier, in such a case, cannot, in the nature of things, comply with his contract to deliver, and as to this force he is not an insurer against loss, although there be no exception in his contract exempting him. Of course, there must be no collusion or instigation of the process by the carrier.

It is to be regretted, in view of the criticisms there have been by other courts, and the conflicting views, about the real extent of this case of *Stiles* v. *Davis, supra,* that it has not been cited or referred to, or the subject considered in any subsequent case by the same court. I think it must be conceded to counsel for the plaintiffs that it is not a precedent for this case; for, as was said by the supreme court of Massachusetts, it was an action of trover, and the question was one of *conversion* by the carrier. It was not therefore decided what would have been the effect of the process of seizure in a suit like this upon the contract of carriage, nor in an action for a violation of the undertaking of the defendant as carrier, where his obligation as such is brought more directly into controversy. But, at last, in the action of trover the question of conversion turned upon the duty of the carrier, under his contract, in relation to the goods. The refusal to deliver to the consignee on the sole ground that they had been attached at the suit of third persons, could have been a conversion only on the theory that the carrier was legally bound, by his undertaking, to deliver, notwithstanding the attachment seizure, the question being whether there was such an obligation. The Massachusetts court confines the decision within very technical limits, manifestly because it did not agree, and courteously did not wish to dissent. It was possibly a new departure in the law of carriers, and it may be that the Massachusett cases adhere more strictly to the harsh rules that refuse to carriers the benefit of some of the more liberal principles applicable to other contracts of bailment. But, I think, until the supreme court itself restricts the case of *Stiles* v. *Davis, supra,* we should apply the principle to its full logical extent, as is done by the Indiana and other courts. *Edwards* v. *White Line Transit Co.* 104 Mass. 159; *Adams* v. *Scott,* Id. 164; *Kiff* v. *Old Colony & N. R. Co.* 117 Mass. 591; *Ohio & Miss. R. Co.* v. *Yohe,* 51 Ind. 181; *Mierson* v. *Hope,* 32 Super. N. Y. (2 Sweeney,) 561; *Bliven* v. *Hudson River R. Co.* 36 N. Y. 403; S. C. 35 Barb. 191; *Rosenfield* v. *Exp. Co.* 1 Woods, 131. Other cases might be cited, but they will be readily traced by those already referred to, and the commentaries of the text-writers on them. Hutch. Carr. §§ 396–408; Ang. Carr. (3d Ed.) §§ 335–337a; Redf. Carr. §§ 103, 125; Lawson, Carr. §§ 17, 18; Schouler, Bailm. 409, 500.

But none of these authorities will justify us in holding that the carrier has discharged his obligation to the consignee with whom he has made the contract, by simple delivery to the officer, or by standing idly by until the process has impounded the goods, and through

it the adverse claimant has appropriated them by the judgment of the court. What is the exact duty of the carrier when the officer seizes the property under legal process? I do not find any full answer to this question on the authorities cited or consulted, nor do the cases in relation to other bailees throw much light on it, manifestly because of the strict rule that generally requires them to defend their possession and justifies a surrender of it only to a paramount owner. Whenever any disaster overtakes the goods the carrier must do everything to preserve and protect them. Hutch. Carr. §§ 201, 202; *Nashville & C. R. Co.* v. *David*, 6 Heisk. 261; *Railroad Co.* v. *Reeves*, 10 Wall. 191; 1 Meigs, Tenn. Dig. § 423, subs. 4. This duty would seem of itself to impose on the carrier the liability of either assuming all the dangers of loss, by wrongful seizure of process, to the consignee by undertaking the defense of the suit with success, or the giving of immediate notice to the consignee to appear and defend for himself. Again, in the cases where the carrier may show that a third party was the actual owner, and the delivery to him was rightful, notice should be given by the carrier to the shipper. *Mierson* v. *Hope, supra,* at page 573. It is because, in the language of Mr. Chief Justice GRAY, "every common carrier of goods, being in the nature of an insurer, is liable—upon grounds of public policy, and to guard against the possibility of fraud and collusion on his part—for all losses by accident, trespass, theft, robbery, or any kind of unlawful taking, and excepting only those arising by the act of God and the public enemies," that the Massachusetts court was loth to follow *Stiles* v. *Davis, supra,* and hold that seizure under process at suit of third parties would excuse non-delivery. *Kiff* v. *Old Colony R. Co., supra.* And it is intimated in some places that so strict is the rule that the carrier must defend the title of his bailor against adverse claims—or what is the same thing, surrender at his peril to any but a paramount owner—that he can find relief only by resort to a court of equity by a bill of interpleader, where there is a controversy about the ownership. Ang. Carr. § 335. *Banfield* v. *Haeger,* 45 Super. (N. Y.) 443; *Willner* v. *Morrell,* 40 Super. (N. Y.) 222, 226.

Evidently, then, it was the duty of the defendant, when the claim of the Bank of Madison was set up, to stand by its consignees' possession and defend it, at least until the consignees could defend for themselves, or to assume the responsibility of abandoning the goods to the adverse claimant, and stand by that title, or to file a bill of interpleader if the defendant was not willing to deliver the goods according to its contract. If demand had been made, as it was, by

the bank, for the cotton, without resort to legal process, and the defendant had complied and voluntarily delivered it to the bank, there can be no doubt it would have been compelled to pay the value of the cotton to the plaintiffs unless the bank's title were the better one; and the *onus* of establishing this would be on the defendant. But the defendant, after at first consenting to surrender to the bank, ultimately refused to do that, but promised to hold the cotton until legal proceedings could be had, and thereupon the bank sued out the writ of replevin, not against the plaintiffs, who were non-residents, in a distant state, and not within the jurisdiction, nor against the property *in rem,* and, as a consequence, against all the world, (for the suit has no such effect as that,) but against the defendant, or, what is the same thing, against its agents in actual possession for the defendant; and the controversy was between it and the bank as to who was entitled to the possession, the defendant, by right of its special property as bailee, or the adverse claimant in replevin by right of a title paramount to that of the defendant's bailor. A bailee so situated, and especially a common carrier, cannot lightly shake off this obligation to defend his possession against an action of replevin to which he alone is a party, and recognized as having a right to defend, upon any loose theory, that there is something in "legal process" alone which protects him. He must do in and about that process all that can be done to defend against it, *or else call in his bailor to defend for himself.* It might be, if our statutes did not allow the real owner to be substituted as a defendant in an action of replevin, that no one but the actual defendant of record—namely, the carrier —could defend; and, in such a case, by all the analogies, and laying aside the special relation of carrier and consignee, the bailee could not release himself of the duty of making defense, or of assuming the *onus* of showing the adverse claim to be the better one, without giving notice to the principal to make the defense for himself. And if, as a fact, the bailor's title were the better, it would be conclusive that the bailee had not discharged his duty in defending the adverse suit, in the absence of a showing that he had given due notice to the bailor to defend it in his own behalf. And this is so in the whole law of agency, and other similar relations, like that of landlord and tenant, and no other rule of law would protect an absent principal against injustice.

It is out of this relation and the duty it imposes on the carrier to successfully defend his bailor's possession and title through his own

special property when sued by an adverse claimant, or to assume the burden of showing the adverse title to be the better one, or to call all claimants into a court of equity to interplead, that notice to the bailor is required if the carrier wishes to relieve himself from these confessedly heavy responsibilities. But, as before shown, public policy requires that at least he shall give this notice if he is to be protected by legal process against the consequences of non-delivery. Without it he cannot be permitted to rid himself of the obligation to deliver at all hazards, particularly since it is doubtful whether anything less than showing the adverse claim to be the paramount one would relieve him from his contract but for the extension of the principle of *Stiles* v. *Davis, supra,* which has been made in behalf of the carrier in this case. Under the few cases where the matter has been discussed, I have no doubt that if we are to depart from the old rule we should under the new require the carrier to give "prompt" or "immediate" notice to the consignee, or in default thereof hold him strictly to the old rule of liability, so that, in the absence of notice, seizure under process shall not excuse non-delivery, unless the carrier shows that the party at whose suit the process of seizure issued has the superior title. As before remarked, there may be less stringency of liability on the carrier where the seizure is by some one claiming the title of the carrier's bailee, as where creditors seize the goods, or they are taken for some fault, neglect, or omission of the bailee himself; but where the carrier's bailee is the rightful owner, and the seizure by process at the suit of strangers is wrongful, as in this case, the carrier cannot be held to a too rigid liability in being compelled to make the same successful defense against the wrongful seizure that the owner could himself make if he had the promptest notice possible under the circumstances, particularly since, in such a case, it is going far to excuse the non-delivery at all because of the process.

The defendant earnestly contends that knowledge is notice, and that the mere failure of the carrier to give formal notice should not charge him, unless it can be shown that actual injury has *directly* resulted from the want of it; and then, only to the extent of such injury; and many analogies, like that of actual notice of an unregistered deed or mortgage, are cited in support of the argument. There is great force in this, and I am not prepared to say that it is not the correct doctrine, although, reasoning from the stand-point of public policy, so well described by Mr. Chief Justice GRAY, in the extract already quoted from *Kiff* v. *Old Colony R. Co., supra,* much may be said in

favor of a commercial necessity for finding the truest analogy in the law of negotiable paper and its protest for non-acceptance or non-payment, and for the same reason, that the speediest and most certain notice is required to enable the rightful owner of the goods to protect himself. Such notice need not be, perhaps, as ceremonious, or exact and prompt, in this case as in that; but the safety of a holder of a bill of lading requires quite as much careful attention as that of parties to commercial paper. No cases have been cited, and I find none, discussing the precise character of the notice to be given, nor do the text-writers examined consider the subject in that light. Some of the cases, like *Stiles* v. *Davis, supra,* make no mention of notice at all, and place no qualification on the broad doctrine that seizure under legal process is a protection to the carrier; but they do not, therefore, leave the doctrine without limitation as to notice. The case of *Ohio & Miss. R. Co.* v. *Yohe, supra,* required such a limitation, and it receives an intelligent one by direct adjudication that the carrier must give *immediate* notice; though the character of this notice, as to its own limitations and qualifications, is not considered, because there, as here, none was given by the carrier, and it does not appear whether there was knowledge from any other source.

In *Bliven* v. *Hudson River R. Co.* 36 N. Y. 403, it is said that seizure by legal process excuses the carrier, "*provided* the bailor is *promptly* notified of such taking;" and what is said in that case in the inferior court about the exemption of the carrier from any obligation to litigate for his bailor must be taken with reference to this requirement of notice. S. C. 35 Barb. 191.

In *Mierson* v. *Hope, supra,* by a very able opinion, the position that the carrier must show that the person suing out the process of seizure was the paramount owner, is maintained with great force. And it is plain that, at all events, notice to the bailee of the carrier of the replevin suits would be required; for the view of the court below, that the production of the records of those suits without more, was a good defense, was thoroughly disapproved. That rejected view of the law is the precise one urged in this case by the defendant, and the authority just cited is fully opposed to it.

*Scranton* v. *Farmers' Bank,* 24 N. Y. 424, 427, contains this language: "It is doubtful whether the bailee has a right to yield to regular legal proceedings without defending, or at least notifying the bailor of such proceedings. See, also, *Weiles* v. *Thornton,* 45 Barb. 390; *Western Transportation Co.* v. *Barber,* 56 N. Y. 552; *Barnard* v. *Kobbe,* 54 N. Y. 516.

The defendant cites some cases where there was actual knowledge in ample time to assert the owner's rights, and where it does not appear that formal notice of the seizure was given by the carrier; but most if not all of them are cited by the Indiana case above referred to, and do not militate against it. *Furman* v. *Railroad Co.* 57 Iowa, 42; *McAllister* v. *Chicago R. Co.* 74 Mo. 531; *Burton* v. *Wilkinson*, 18 Vt. 188; *Van Winckle* v. *U. S. Mail Steam-ship Co.* 37 Barb. 122.

I dare say if the owner accompany the goods or otherwise be present at the seizure, or if he have notice from other sources as promptly as he is entitled to it from the carrier, that the mere neglect of the carrier to give formal notice might not, under all circumstances, be held to bind him to the strict liability he would be under in the application of the doctrine of *jus tertii*, if he surrenders the goods to a third party claiming an adverse title; and, perhaps, in such a case knowledge might be equivalent to notice. But such is not this case. There is no proof here of any knowledge by the plaintiffs of the replevin suit until several months after the seizure was made, positive proof of the date of their earliest knowledge from any source being the commencement of this suit on the bill of lading; all else is inference.

Lawsuits are subject to many vicissitudes, such as the insolvency of parties and of sureties on indemnity bonds, the disadvantages arising from delay and from the loss of proof, the shifting rights of parties under rules of practice dependent on the efflux of time, like that —mentioned at the bar—of a loss of the privilege of removing the case from one state court to another, or to the federal court, and many others that could be mentioned. To throw the loss on the distant owner would be unjust, and the carrier cannot, on any principle of fairness, claim to do this by supinely letting things take their course on any theory that he is protected by "seizure under legal process." Nor does the fact that in any particular case the party making the seizure and his bondsmen remain solvent, alter the principle. The rules of notice should be fixed to cover all cases as far as possible, and protect owners of goods in the hands of carriers to the fullest extent. It will not do, in view of the law of bailment, and especially of common carriers, to throw the *onus* of showing actual loss by delay of notice on the bailor where the bailee has been negligent in giving it. Possibly, if the bailee or carrier can show to the entire satisfaction of the court and jury that no damage has resulted, he may escape; but it seems to me nothing less than a full showing of actual knowledge quite as early as would have resulted from proper notice by the carrier should be satisfactory proof of want

of injury. We cannot say that the plaintiffs here, by becoming defendants to the replevin suit still pending, will now have all the advantages of defending their title they would have had by entering the suit at its commencement, had they been notified in time to do so, although the bank of Madison and its sureties on the replevin bond may be still solvent. At the bar it is said they have lost the right of removal to this court, and it may be many more valuable privileges and advantages; but these the court cannot weigh to determine whether there has been injury by delay. Disadvantages of this kind may have existed at the time of the plaintiffs' first knowledge, some months after the seizure in replevin. It seems to be quite well understood that the failure of the carrier to notify the consignee of arrival, charges him absolutely for any subsequent loss, even by seizure under process; and by analogy it would seem not unreasonble that a failure to promptly notify of the seizure by process should have the same effect. *Mierson* v. *Hope, supra;* Hutch. Carr. §§ 357–375.

I am satisfied, in the absence of guidance by authority, to rule that nothing less than proof of actual knowledge, at a time sufficiently early to be equivalent to immediate notice by the carrier, will suffice to excuse delay in giving notice; and that a delay of several months, as in this case, fixed the liability of the carrier; and this, whether it be ultimately established by competent judicial adjudication that formal notice by the carrier in due time is essential to his protection, —as, I am bold to say, I think it should be,—or that knowledge in due time is equivalent to such notice by the carrier. Nor do I think the fact that, after the adverse decision of the demurrer in this case, the plaintiffs here, as a precautionary measure, availed themselves of the statutory privilege of becoming parties defendant to the *replevin* suit, affects the question under consideration. It was proper for them to place themselves in a position to take advantage of an adverse decision in this suit. They were in no attitude to be compelled to elect between their remedy against the carrier and that to recover their goods. It seems to me they might pursue both, having, of course, only one satisfaction. The final judgment in this case may operate to transfer the title in the goods to the carrier, but that cannot injure the defendant nor benefit the plaintiffs. Possibly nothing less than satisfaction of the judgment would affect this result, but in any event I do not see that the fact that plaintiffs became codefendants in the replevin suit prejudices their rights or remedies in this suit.

To this point I have altogether laid out of view the facts of this case tending strongly to show collusive action between the agents of the railroad company and the bank in the matter of the seizure of the cotton. The agent frankly stated that in the struggle to get possession he promised the bank to hold the cotton until legal proceedings could be instituted. The bank's witnesses stated that the agents promised to surrender the cotton, and it was sought to prove a constructive surrender by them and Chiles, the fraudulent shipper, to the bank. These facts illustrate the necessity for the rigid rules against carriers which have been mentioned, and re-enforce what Mr. Chief Justice GRAY said, as already quoted.

It was the plain duty of the railroad company to forward the cotton without delay, and it could not in good faith hold it to give adverse claimants opportunities for seizure. The excuse offered is that the bill of lading called for 32 bales and only 27 had been delivered, and that the course of business was to await the full complement before shipping; but this does not condone the promise to hold and the holding of it for seizure under legal proceedings. It was fully known that Childs had failed and could not complete the complement, as fully that the bank was trying to get the cotton, and that it belonged to the plaintiffs, so far as the carrier's duty was concerned. An intention to defraud the plaintiff by the carrier is not necessary, nor such intention on the part of others concerned, to impose liability for this collusion, for the result is the same however innocently or ignorantly it was entered into. The cases heretofore cited recognize that any collusion of the carrier or other bailee will make him liable. It is a conversion. See, also, *Ball* v. *Liney,* 48 N. Y. 6; S. C. 44 Barb. 505; *Barnard* v. *Kobbe,* 3 Daly, 35; S. C. 54 N. Y. 516.

A supplemental ground for new trial is urged for the defendant. Their general attorneys and other agents file affidavits, stating that by telegram and letter the plaintiffs were immediately notified of the seizure. The excuse offered for not producing this evidence at the trial is that the local attorney was not aware of the facts, and the general attorneys expected to be present at the trial but were prevented from attending by a belief that the case would not be heard because of a previous loss of papers, which it was thought would cause delay. It is too plain for any argument that new trials should not be granted on such a showing as this. The rule against it is universal, and nowhere more strict than in Tennessee, and the policy involved is too important for mere indulgence by a court. All will admit that this court is very liberal in prac-

tice in this regard, and in this very case allowed testimony to be admitted after the arguments were closed; but after verdict such indulgence would be fatal to a sound and wholesome administration of the rules of law. *Young* v. *Stringer*, 5 Hayw. 31; *Tabler* v. *Connor*, 1 Baxt. 197. It is sufficient to say that this evidence should have been put in possession of the local attorney long before the trial, and certainly should have been on hand at that time. The excuse offered is insufficient. This proof would show all the notice the most rigid ruling could require, but on a new trial the verdict might well be the same on the ground of collusion.

Overrule the motion.

See *Robinson* v. *Memphis & C. R. Co.* 9 Fed. Rep. **129.**