THE CAPITAINE FAURE. COOPER & COOPER, Inc., v. CAMERON et al. HARRISONS & CROSFIELD, Limited, v. SAME.

(Circuit Court of Appeals, Second Circuit. February 1, 1926.)

No. 141.

1. Shipping ⬤═105—Shipowner liable only for goods delivered.

Though shipowner may become liable for goods before they are placed on shipboard, to make him responsible it is necessary that goods be delivered to him or to his authorized agent.

2. Shipping ⬤═106—Dock receipt not the contract governing right of shipper against shipowner, where "bill of lading" given.

Dock receipt is not contract of affreightment, nor necessarily a delivery to ship, and, as respects shipments in which bills of lading are issued, the "bill of lading" is, as between shipowner and shipper, the statement of the contract between them.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bill of Lading.]

3. Shipping ⬤═41—Charterers of ship are in certain respects owners pro hac vice, and can bind ship in certain matters.

Charterers of ship are in certain respects owners pro hac vice, and can bind ship in certain matters.

4. Shipping ⬤═50, 106—Master held entitled to sign bills of lading and charterers bound "to indemnify" owners against loss resulting therefrom.

Under charter providing that charterers should take over ship and indemnify owners against consequences of master's signing bills of lading, held, that master had right to sign bills of lading, but charterers were bound to indemnify owners against consequences thereof; "to indemnify" meaning to make good a loss.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Indemnify.]

5. Shipping ⬤═106—Bills of lading, dated before arrival of vessel, and stamped "On board," after goods were placed on board, without indicating date thereof, held unlawfully issued (Act Aug. 29, 1916 [Comp. St. §§ 8604aaa–8604w]).

Bills of lading, dated before arrival of ship, reciting that goods were received for shipment, stamped "On board" after goods were actually on board, without indicating date thereof, held unlawfully issued, under Pomerene Act Aug. 29, 1916 (Comp. St. §§ 8604aaa–8604w).

6. Shipping ⬤═106—Master has no power to bind shipowners by false bills of lading.

Generally master of ship has no power to bind shipowners by false bills of lading.

7. Shipping ⬤═106—Statute prohibiting false bills of lading, enacted to prevent fraud, should not be construed to work fraud between shipper and shipowner (Act Aug. 29, 1916 [Comp. St. §§ 8604aaa–8604w]).

Pomerene Act Aug. 29, 1916 (Comp. St. §§ 8604aaa–8604w), prohibiting issuance of bills of lading containing false statement as to receipt of goods, enacted to prevent fraud, should not be given construction which would work fraud between shipper and shipowner.

8. Shipping ⬤═106—Bills of lading, falsely showing goods are aboard ship, held binding on ship, where goods are afterwards received on board and not transported to destination.

Bills of lading, falsely showing that goods are aboard ship, are binding on ship, where goods are afterwards received on board and not transported to destination.

9. Shipping ⬤═106—Master is owner's agent to sign bills of lading, and such contracts, entered into in good faith, bind ship.

Master's contracts relative to usual employment of ship bind owners, and master is

owner's agent to sign bills of lading, and such contracts, entered into in good faith and within scope of his apparent authority, bind ship, irrespective of its ownership, whether master is agent of general or special owner.

**10. Shipping ☞154—Where ship never breaks ground and voyage is abandoned, ship has no lien on goods.**

Where ship never breaks ground and voyage is abandoned, ship has no lien on goods for freight.

**11. Shipping ☞105—Action in rem lies for breach of contract of affreightment, where goods have been actually delivered on ship.**

Action in rem lies for breach of contract of affreightment, where goods have been actually delivered on ship.

**12. Shipping ☞143—Shipowner is not liable as carrier merely because of his ownership, but one having control of vessel is liable to shipper.**

Shipowner is not liable as carrier merely because of his ownership, but is liable only if ship is within his employment, and party having control of ship and in whose business it is engaged is regarded as owner pro hac vice, and is liable to shipper.

**13. Shipper ☞106—Master's authority to bind ship and shipowner by signing bills of lading stated.**

Master cannot bind shipowner by· signing bill of lading for goods never shipped, nor can he bind ship by signing second bill of lading for goods on board for which he has already signed one bill.

**14. Shipping ☞39, 106—Where charter is demise of ship, shipowner is not liable on bills of lading signed by master.**

Where charter is demise of ship, shipowner is not liable to shippers on bills of lading signed by master, even if shippers do not know of charter; whether charter amounts to demise depending on whether owner has parted with full possession and control during period of charter party.

**15. Shipping ☞39, 106—Charter held not a demise of ship, and master, in signing bills of lading, bound ship.**

Charter whereby owners furnished ship, master, and crew, and charterers had no power to displace master or crew, master to be under charterer's orders as to employment, agency, or other arrangements, charterers to indemnify owners against consequences arising from master's signing of bills of lading, held not a demise, and master, in signing bills of lading. bound ship.

**16. Shipping ☞133—Ship hypothecated to shipper for damages for failure to transport goods.**

In every contract of affreightment, whether by charter party or bill of lading, ship is hypothecated to shipper for any damage sustained by goods through failure to transport them safely; injuries not being result of excepted perils.

**17. Principal and agent ☞161(2), 164(1), 175 (3)—Principal may repudiate or ratify unauthorized act; principal's ratification of agent's unauthorized act is equivalent to prior authority to perform it.**

Principal may repudiate or ratify unauthorized act by one assuming to act as agent, and, if he ratifies such act, it is equivalent to prior authority, and relieves agent from any liability to third person, if such person is not thereby placed in worse position than he would have been, had agent acted under prior authority.

**18. Shipping ☞106—Master's approval and signing of bills of lading issued by subcharterer before arrival of ship held ratification thereof, binding on ship.**

Master's approval and signing of bills of lading, issued by subcharterer without authority before arrival of vessel, held ratification thereof, which bound ship.

**19. Shipping ☞106—Master's approval of issuance and delivery of bills of lading by subcharterer held ratification thereof, binding on vessel.**

Master's statement, when informed that bills of lading had been issued and delivered by subcharterer, and that others might be so issued, that it was "all right," held ratification thereof, binding on ship; no particular form of ratification being necessary.

**20. Principal and agent ☞167—Generally ratification may be by parol.**

General rule is that, except where ratification in writing is required by sealed instrument, or statute, principal's ratification of agent's unauthorized act need not be in writing, but may be by parol.

**21. Shipping ☞106—Master's letter, authorizing subcharterer to sign bills of lading, held ratification, binding on ship.**

Master's letter, authorizing subcharterer to sign bills of lading in master's behalf as agent for owners and charterers, held ratification of such bills of lading, binding on ship.

**22. Shipping ☞133—Suit in rem against ship for breach of contract to carry cannot be defeated by showing that suit might or might not have been brought against charterer in personam.**

Shipper's suit in rem against ship for breach of contract to carry under bill of lading cannot be defeated by showing that suit might or might not have ·been brought against charterer in personam under dock receipt.

**23. Shipping ☞106—Ship, discharging cargo for nonpayment of charter hire, held liable to shippers under bills of lading signed by master.**

Though charterer's default in paying charter hire relieves shipowner from contract with charterer, it did not relieve ship from liability to safely transport goods under bills of lading signed by master, notwithstanding ship had not broken ground.

**24. Shipping ⬤⟿130—Shipper should mitigate damages by forwarding goods by other means, if possible, where ship wrongfully discharges cargo.**

Where ship wrongfully discharges cargo, it is shipowner's duty to mitigate damages, as far as possible, by forwarding goods by other means.

**25. Shipping ⬤⟿131—Shippers' measure of damages for ship's wrongful discharge of cargo stated.**

Where cargo is wrongfully discharged by ship, shipper's measure of damages as to goods forwarded by other means is difference between market value at destination when they would have arrived by ship, and market value when actually received, plus freight and other necessary expenses; as to goods not reshipped it is difference between their market value at destination when they should have arrived and market value on arrival of next available ship; market value at place of shipment being considered only if goods cannot be forwarded because of lack of other means or want of markets at destination.

Appeals from the District Court of the United States for the Eastern District of New York.

Separate libels by Cooper & Cooper, Inc., and by Harrisons & Crosfield, Limited, against the steamship Capitaine Faure, Reuben I. Cameron, the Fulton Steamship Corporation, and the Société de Navigatione a Vapor France Indo-Chine. From a decree for libelants (1 F.[2d] 406), granting relief less than that demanded, libelants appeal. Decree modified.

The libelant Cooper & Cooper, Inc., is a corporation organized and existing under the laws of the state of New York, and maintaining an office in the borough of Manhattan in the city of New York; and the libelant Harrisons & Crosfield, Limited, is a corporation organized and existing under the laws of Great Britain, and maintaining an office for the transaction of business in Montreal, in the Dominion of Canada.

The Fulton Steamship Corporation, hereinafter called the Steamship Corporation, is a corporation organized under the laws of the state of Delaware, and it maintains an office in the borough of Manhattan in the city of New York. It is the agent of the charterer of the Capitaine Faure. The charter provided that the charterers should have the option of subletting, giving notice to owners, but that original charterers were always to remain responsible to owners for due performance of the charter.

Thereafter a "berth agreement" was entered into between Reuben I. Cameron, styling himself "time-chartered owner" of the ship, and the Fulton Steamship Corporation, called in the agreement the charterers. By this agreement "the time-chartered owner," Cameron, placed the ship at the disposal of the charterers, the Fulton Steamship Corporation, "for a voyage to Far East ports, to load the steamer on berth as advantageously as possible at the best rates and conditions obtainable." The agreement provided that:

"The time-chartered owners have to pay all port charges, pilotages, commissions, and so forth, at both loading and discharging ports, including stevedoring, tallying, and all expenses which will accrue in the interest of the cargo and against the steamer; whereas, the charterers undertake to do their best to secure the most profitable rate of freight, to load and ship as quickly as possible, and keep the expenses as low as possible. The time-chartered owners accept liability for proper stowage, dunnage and discharge of steamer, and for any claims on the cargo and for any claims made by and/or against the vessel. * * *

"The time-chartered owners agree to instruct the captain to take all orders from the charterers or the agents just the same as if the charterers were the time-chartered owners."

The respondent Société de Navigatione a Vapor France Indo-Chine is a corporation organized and existing under the laws of the republic of France, and maintaining an office in the city of Paris. It is the owner of the steamship Capitaine Faure.

Reuben I. Cameron is an individual doing business in his own name in the borough of Manhattan, city of New York, and is the charterer of the steamship Capitaine Faure.

The two libels were filed against the steamship Capitaine Faure in rem and against her owner, Société de Navigatione a Vapor France Indo-Chine in personam, and also against Reuben I. Cameron, the charterer, and the Fulton Steamship Corporation, which booked the cargo for the voyage under a subcharter agreement with Cameron, the charterer.

The owner of the vessel appeared and filed a claim thereto, and a stipulation for value, under which the ship was released, and answered the libels as claimant and respondent. The other two respondents, Cameron and the Fulton Steamship Corporation, defaulted.

For purposes of trial the suits were consolidated. The court rendered an opinion allowing libelants a recovery against the ship on some of the bills of lading, but not

on others. The other holdings of the court will appear in the opinion of this court on the appeal.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., John W. Crandall, and Arthur H. Haaren, all of New York City, and Leo C. Fennelly, of Brooklyn, N. Y., of counsel), for appellants.

Burlingham, Veeder, Masten & Fearey, of New York City (Roscoe H. Hupper and William J. Dean, both of New York City, of counsel), for the Capitaine Faure and owner. ·

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). These libels were filed in· causes of admiralty and maritime jurisdiction. The libelants sued the steamship and the owner thereof, the charterer, and the agent of the charterer. The libelants allege that in the months of April and May, 1923, they shipped and placed on board the steamship, then lying in the port of New York, bound for various ports of Japan and China, certain merchandise in good order and condition, consigned to the order of the respective shippers, under and in pursuance of bills of lading issued for such shipments in a manner hereinafter more fully stated, and that the respondents thereby became bound jointly and severally to transport the said goods from the port of New York to the ports of Japan or China named in the bills of lading, and there to land and deliver them in like good order and condition as shipped. They also allege that the steamship never sailed from the port of New York on the intended voyage, but remained at the wharf where the shipment was loaded, and where the ship was at the time the libels were filed.

The suits are brought to recover for the breach of the contracts of carriage and for the failure to deliver the shipments. They are also brought to recover damages on the ground that the goods are not now in· like good order and condition as when· received for shipment, but are shot, pilfered, ullaged, damaged, and otherwise injured by the unseaworthiness of the ship and the fault of the vessel and the other respondents in connection with the loading, handling, and stowage, custody and care of the goods.

Under the·first libel the amount asked is $138,650, together with interest, costs, and disbursements; and under the second libel the amount demanded is $16,000, together with interest, costs, and disbursements. The total amount involved is $154,650, together with the interest, costs, and disbursements in the suits.

The steamship Capitaine Faure was chartered to Reuben I. Cameron on March 21, 1923, for a period of six months, and it was expressly provided that the charterer should have the option of subletting the vessel. This option Cameron exercised by entering into a berth agreement with the Fulton Steamship Corporation, which placed the steamer at the disposal of the latter for a voyage to Far East ports. The original charter to Cameron provided that payment of hire was to be made in cash in New York, every 30 days in advance, and in default of payment the owners "have the right of withdrawing steamer from the service of charterers, without noting any protest, and without the interference of any court or any other formality." And in the berth agreement, made by Cameron with the Fulton Steamship Corporation, the latter agreed to advance "one month's charter hire, which amounts to $10,990.80 on date same is payable." That amount was paid when it became due, not by Cameron, but by the Fulton Steamship Corporation, in accordance with its agreement with Cameron. That was the only payment to the owners of the ship that the Fulton Steamship Corporation had agreed to assume. The second payment was to be paid by Cameron on May 9, 1923, but he was unable to make the payment at the time it was due, with the result that, although the ship was loaded and ready to sail on May 7, 1923, the owner of the vessel instructed the master that he must not allow the ship to start on her voyage and she never did. Instructions were given to unload her cargo at New York and it was accordingly unloaded.

This cargo had been procured by the Fulton Steamship Corporation and had been loaded on board the vessel pursuant to its orders, and by virtue of the berth agreement it had made with Cameron. The failure of the ship to start on her voyage and carry the goods on board to their destination in Japan and China is the cause of these suits. They are not brought by the owner of the ship, but by the owners of the cargo.

The Fulton Steamship Corporation, after the berth agreement was signed, went into the market and engaged cargo to be forwarded on the Capitaine Faure from New York to Yokohama, Kobe, and Shanghai. It also engaged· cargo from New Orleans, and between the ports of New York and New Or-

leans was booked full, and the Fulton Steamship Corporation had to stop booking.

At New York the Fulton Corporation issued permits to the shippers to put the cargo on the dock, and when the goods were delivered at the dock those in charge issued dock receipts on Fulton Steamship Corporation stationery, which were signed in its name by its receiving clerk. These dock receipts read as follows:

"Fulton Steamship Corporation regular bill of lading in use by it for similar shipments (upon the basis of which freight rates are fixed) shall be issued for said goods to the above-named shipper. Fulton Steamship Corporation shall not become responsible for the goods as carrier until the goods are actually loaded on the steamer; until such loading it shall be liable only for loss or damage occasioned by its fault, such as an ordinary bailee is liable for, but subject also to the conditions, exceptions, and limitations of liability and value contained in said regular bill of lading, with which shippers are understood to have acquainted themselves, and to which they assent."

[1, 2] The language used in these receipts is relied upon to fix responsibility on the Fulton Steamship Corporation rather than on the ship for its failure to carry. A dock receipt is not a contract of affreightment. It is not necessarily a delivery to the ship. It is true that the shipowner may become liable for the goods before they have been actually placed on board. But to make him responsible it is necessary that the goods should be delivered to him or to his authorized agent. Carver on Carriage by Sea (7th Ed.) § 68. A dock receipt, not issued by one as agent, undoubtedly makes the one issuing it liable for its performance, even though the principal for whose benefit it was in fact made may also be liable. But the shipper is entitled to have a bill of lading, and in the shipments herein involved bills of lading were issued. As between the shipowner and the shipper, the bill of lading is the statement of the contract between them.

[3, 4] Bills of lading are commercial documents upon which the shippers and their indorsees are entitled to rely. The charterers were in certain respects in the position of owners pro hac vice, and could bind the ship in certain matters. But the charter itself did not expressly authorize the charterers to sign bills of lading or to appoint the master. The charter provided that the charterers should take over the ship with its master, officers, and crew. The charter contained the following provision: "Charterers to indemnify owners against all consequences or liabilities arising from captain, officers or agents signing bills of lading or other documents, or otherwise complying with such orders, as well as from any irregularity in steamer's paper or for over-carrying goods."

This indicates to us that, while the master was to have the right to sign bills of lading, the charterers were bound as between themselves and the owners to indemnify the latter against the consequences thereof. To indemnify is to make good a loss. It is to reimburse one for a loss incurred. If the ship was not to be bound by a bill of lading signed by the master, why any necessity for the statement that the charterers were to indemnify the owners against the consequences of his doing so? And these libels are not brought on the dock receipts as mentioned in the pleadings, but on the bills of lading. And it is on the bills of lading that this case must be decided.

The Steamship Corporation issued the permits to put the cargo on the dock, and on its stationery dock receipts were issued by men in charge of the pier, and who were engaged and paid by the charterer of the ship. The bills of lading were issued by the traffic manager of the Steamship Corporation, and the freight was paid to that corporation by checks payable to it, with the exception of two made payable to the master of the vessel, and were by him indorsed to it. Most of the bills of lading were signed by the Steamship Corporation as agents for the master of the ship. It signed no on-board bill of lading, but they were signed "at the dock or at the port of loading, for shipment." After the ship arrived at New York the bills of lading were signed by the master, although a few were even then signed by the Steamship Corporation.

As to the bills of lading the following testimony was given:

The president of the Fulton Steamship Corporation testified as follows as to the bills of lading which were brought to the attention of the master on the arrival of the ship in New York:

"Q. Do you remember the bills of lading being in two piles when the captain came in? A. The first time the master was requested to sign the bills of lading, they were arranged on a small table in the outer office, near the door to the Fulton Steamship Corporation's private office, in two piles.

"Q. What did those piles each contain? A. One pile contained a number of ladings

ready for signature. The other pile consisted of the ladings that had been signed and issued by the Fulton Steamship Corporation.

"Q. What did you say to the captain about these piles of bills of lading? A. I asked the captain to sign the ladings that were waiting for signature. I showed him where to sign, and which ladings to sign, and which to initial. I showed him the ladings that had been signed, and told him that this cargo had already been signed for by the Fulton Steamship Corporation. He asked if the cargo was on the dock, and I told him, 'Yes; that we issued no bills of lading until we had the cargo in our possession, and that the cargo was either on the dock or going into the ship at that time.' He signed the bills of lading that I asked him to sign. He looked over the others in a perfunctory sort of way, and I asked him if everything was all right, and he said it was.

"Q. Did these bills of lading that you showed him, that had been signed by the Fulton Steamship Corporation, have on them the signature of the Fulton Steamship Corporation as agent for the master? A. Yes.

"Q. Did you show him that signature? A. Yes.

"Q. And you asked him if that was all right? A. Yes.

"Q. And he said what? A. Yes.

"Q. Did he make any objection to the bills of lading that were signed by the Fulton Steamship Corporation, as agent for the master? A. No, sir.

"Q. Did you explain to him why you had to sign those bills of lading before the ship got here? A. I mentioned the fact that the reason their bills of lading were signed was because some of the shippers desired to have their documents for banking purposes.

"Q. Do you remember saying to him that it was also because he was detained? A. Yes, sir; I told him the fact that the ship was late in arriving, and was advertised to sail from New York on the 26th or 28th of March, before her arrival.

"Q. Did he subsequently ever make any objection to your signing those bills of lading as agents for the master? A. No, sir; as far as I could judge from his attitude, he was very agreeable and very affable. He made no objection whatsoever.

"Q. Was all this cargo for which you issued bills of lading put on board the vessel? A. Yes.

"Q. And later discharged by her? A. I understand it was all discharged."

And on cross-examination this witness testified as follows (concerning his interview with the master) :

"Q. You didn't have any letter from the captain, telling you to sign bills of lading, did you? A. No; I did not have a letter from the captain, telling me to sign bills of lading.

"Q. He had not written you with respect to bills of lading? A. He had not; but, when I first asked him to sign bills of lading, I had with me at the time another pile on the same table, a copy of the bills of lading that had been signed and issued, and I called his attention to that, and showed him how the Fulton Company had signed them, and told him why they had signed.

"Q. Give us the conversation? A. I can give you the gist of the conversation. As near as I can recollect, I said, 'Captain, here are some ladings for you to sign.' I had to show him quite plainly that it was not necessary to write his full name on all the copies of each set of lading, but to sign one or two negotiable copies, and initial the piles on copies of each set. He went ahead and signed, and made no objection whatever.

"Q. Was that all that passed between you with regard to the piles? A. That was all. He said, 'Is this cargo on the dock?' And I said, 'All that cargo is on the dock, or is now going into the ship.' I didn't know what had been loaded at that time, but I knew that the loading had started. I then showed him the balance of the ladings which had been issued by the Fulton Steamship Corporation, I said, 'These have already been issued, and you will not be required to sign these. We have had to sign them, because the shippers wanted their ladings, and the ship is late. She should have been here on the 26th or 28th; we had advertised her for those dates.' He looked at them. He asked me again, 'Is that cargo all right? Have you the cargo?' I said, 'Yes; the cargo is in our possession, and is going on board the ship;' and he said, 'That is all right.' I pointed to him where the signature was to be made, and how it was made, and he asked me who these people were. I think some had been signed by Everson and a couple by Brockstedt, and I said they were employees of the Fulton Steamship Corporation. They were signed, these bills of lading were signed, as agents for the master.

"Q. They had some statement, 'Agents for the master?' A. Agents for the master.

"Q. Did the master then say, 'Who gave you authority?' A. No; he said it was all right. * * *

"Q. You say the captain of that ship did not write you any letter, stating that you should sign bills of lading for him. Is that correct? A. He did not write me a letter to that effect.

"Q. And he did not verbally request you to sign any bills of lading for him? A. He said it would be all right for me.

"Q. Well, did he ask you to sign them? A. No; he said it would be all right if I signed them.

"Q. You showed him some that had already been signed? A. Yes; and I told him that I might sign more.

"Q. When was that? A. That was on the first or second time he came in, and he said, 'It is all right.' He waved his hand. He said, 'It is all right;' to go ahead and do what we were doing, and what we had planned to do. In other words, he submitted a verbal approval on the whole thing, without any indication of disapproval.

"Q. Did he ask you to attend to the signatures of the bills of lading in his absence? A. No; the question of his absence was not brought up definitely.

"Q. You don't recollect how many you signed after that? A. No; but very few. I will say that.

"Q. Why didn't you sign them all? A. I preferred to have the captain sign them.

"Q. You said he said it would be all right for you to do it? A. Yes; and for that reason we signed a few; three or four more."

And afterwards, on redirect examination, he testified as follows:

"Q. Do you remember when your company obtained a letter from the master of the ship authorizing the signing by your company of certain bills of lading (handing witness paper)? A. Yes; this letter was obtained from the master.

"Q. Was that at the request of a particular shipper? A. Yes, sir."

The letter was received in evidence and is found in the margin.[1] This letter was the only one the witness could remember the master had given to the Fulton Steamship Corporation concerning the signature of bills of lading.

The assistant traffic manager of the Fulton Steamship Corporation testified as follows:

"Q. What took place on that day (May 5th) with reference to the bills of lading for the cargo? A. I gave Capt. Jaeger all the bills of lading, and Capt. Jaeger turned them over to the captain (master of the ship) for signature.

"Q. Were you there when Capt. Jaeger gave the bills of lading to the captain that he was to sign? A. I saw him turning them over to him; yes.

"Q. Did the captain sign them? A. Yes; the captain signed them.

"Q. Did you say anything to the captain about signing some bills of lading before he arrived? A. I told him that we had had to in some cases before he got in, being he was late getting in to New York.

"Q. What did he say to that? A. He said that was perfectly all right that we did that.

"Q. Before the ship was completely loaded, did you show the captain the bills of lading signed? A. He sat down with me, and I went over the bills of lading that we had, and showed him all the bills of lading that we had signed and that he had signed. * * *

"Q. Did he ask you anything at that time as to whether the goods were on the ship or not? A. He asked me if they were on the ship, and I said they were either on the ship or on the dock, loading into the steamer.

"Q. Was there any discussion at all about any bills of lading that had been signed by you? A. No; there was none. I showed him everything that I had signed, and he said everything was all right. He didn't make any objection to any of it.

"Q. Did he or not make any objection to taking any of the cargo on the vessel for which you showed him bills of lading? A. At no time.

"Q. Did he make any objection at any time to your signing any of the bills of lading that you signed? A. No; everything was perfectly all right that I signed. * * *

"Q. Did you issue any dock receipts, unless the goods had been received? A. No, sir; not unless we had the goods on the pier.

"Q. The bills of lading that were signed bore dates with reference to the receipt of the goods? A. Those are the dates that I had the bills of lading, or that they were dated, after we had received the freight on the pier.

---

[1] "This is to certify that I, Cretin Perny, master of the vessel Capitaine Faure, authorized the Fulton Steamship Corporation, by J. H. Everson, to sign for and in my behalf, as agent of the owners and charterers of the steamship Capitaine Faure, bill of lading No. 22, covering shipment of 1,120 bags of Ammo-Phos shipped by American Cyanamid Company from New York to Kobe, Japan, to be delivered unto order of Omi Bank, notify Ando Gomei Kaisha, dated April 27, 1923.
                    "P. Cretin Perny,
"Master, as Agent for Owners and Charterers."

"Q. You did sign several bills of lading after the Capitaine Faure was in port? A. On several occasions we had to, on account of the fact that the shippers wanted to get their bills of lading in to the bank before the bank closed.

"Q. Do you remember whether you said anything about that to the master? A. Yes; I showed the master what we had done, and that was perfectly all right. I told him we couldn't wait till he came in.

"Q. You did sign all the bills of lading in the same way? A. Yes.

"Q. You signed them all as agents for the master? A. As agents for the master. * * *

"Q. Before the captain signed the bills of lading as he came into your office from day to day, what about the dock sheets? Did you ever show them to him? A. I always showed him the dock sheet before I gave him the bills of lading, showing that the marks and the numbers on the bills of lading agreed."

It appears that the Steamship Corporation had issued certain bills of lading stamped, "On Board, Fulton Steamship Corporation, Agents for Master," and which were afterwards signed by the master. The assistant traffic manager testified that he had himself affixed the "On Board, Fulton Steamship Corporation, Agents for the Master," and that on most of those so stamped he had himself stamped them, and that some of them were so stamped in April. The ship did not arrive in New York until May 4th. He was asked why he had so stamped them and replied, "Because the shippers required it." He testified as follows:

"Q. Did they tell you they wanted 'on board' bills of lading by a certain date in any case? A. In some instances they required it; yes, sir.

"Q. By a certain date? A. On a certain date; yes, sir.

"Q. Did they tell you why they required it? A. To meet the credit in the bank.

"Q. Do you mean that, unless they got a bill of lading showing that the goods were on board as of a certain date, they could not comply with the requirements of the bank credits? A. Well, I don't know whether the bank credits required 'on board' bills of lading, but they requested them.

"Q. They told you that that was the purpose for which they wanted them? A. To present them to the bank; yes.

"Q. You know, as a matter of fact, don't you, from your business experience, that bank credits generally run for a certain period? A. Yes.

"Q. And that bills of lading are supposed to be presented against them within that certain period? A. Yes.

"Q. That is to say, the buyer of the goods in Japan will establish a credit with a bank here? A. Yes.

"Q. By means of which the seller of the goods here will be paid for the goods if he turns in to the bank here before the expiration of the credit the proper documents, the invoice and the insurance policy and the bills of lading? A. Yes.

"Q. That is a correct statement of the situation? A. Yes.

"Q. And when you secured for these various shippers 'on board' bills of lading, you did it in order to enable them to comply with their credit arrangements? A. That is right."

On redirect he testified:

"Q. With reference to these 'on board' bills of lading, were all of those signed by the master? A. All 'on board' bills of lading were signed by the master. * * *

"Q. Do you recall whether any of these bills of lading had been issued before, and that the shippers brought them back to be stamped 'on board?' After they were on the ship? A. There may have been several that were taken back by the shippers, when the bank would not accept them unless they were 'on board' bills of lading, to meet the requirements of the credit.

"Q. That is chiefly done when a shipper gets a bill of lading 'received for shipment'; to come back and ask him to stamp it 'on board,' when it is actually on the ship? A. Yes.

"Q. So far as you know, is there any way of your telling whether the shipper's credits required 'received for shipment' bills of lading as of a certain month, or whether it required an 'on board' bill of lading as of a certain month? A. The banks had the credits, and I never saw them.

"Q. Even though a 'received for shipment' bill of lading is issued for a certain month, have you had experience of a shipper coming back afterwards and requiring an indorsement that the cargo was on board? A. Yes; I have had that on several occasions. When the banks would not accept the papers as they were, they had to get them fixed up to meet the requirements of the credit. * * *

"Q. Was there any bill of lading marked 'on board' without the cargo being actual-

ly on board? A. No, sir; nothing was stamped 'on board' unless the cargo was on board.

"By the Court: Q. Who made the indorsements? You? A. The captain signs his name and makes all indorsements on 'on board' bills of lading.

"Q. But did he put the stamp 'on board' on? A. No; we did that in our office.

"Q. How did you know whether it was on board or not? A. We checked it up with the pier before we did it. We called them on the phone. * * *

"Q. Is it not also the custom to put on the date when the notation 'on board' is put on? Here is your bill of lading, dated April 30. If the goods are not put on board until May 5th, isn't it the custom to put right on 'on board,' May 5, 1922? A. I didn't put any date on 'on board' because the captain had knowledge of it, and he agreed that it was all right.

"Q. Isn't it the custom, whenever you make the notation 'on board,' to note also the date of their going on board? A. I put the 'on board' stamp for all cases, and I never put the dates alongside of the 'on board' stamp."

[5] As we understand this testimony, it appears that bills of lading which showed "received for shipment," and which were dated prior to the arrival of the ship, were in some cases brought back and stamped "on board," but were never so stamped until the goods were actually on board; but the date when so stamped "on board" was not indicated, and the only date which appeared was the date on which the bill of lading was originally issued.

These bills were unlawfully issued. The witness was asked if he knew he was doing wrong in issuing such a bill of lading:

"Q. Will you answer the question? Did you or did you not know that you were doing wrong in procuring the signature of an antedated bill of lading, representing that the goods were on board before they were actually on board? A. No; I have done that in other cases; I did not know, because I have done it in other cases.

"Q. Do you know that there is a section in the United States law known as section 41 of the Pomerene Act concerning bills of lading, which is the 39th Federal Statutes, page 544, which makes it a misdemeanor punishable by fine or imprisonment, or both, for making a false statement in a bill of lading with regard to the receipt of the goods?

"The Court: You are not bound to answer any question that might tend to incriminate or degrade you; any question that might tend to convict you of a crime you may refuse to answer on that ground.

"The Witness: I don't want to answer that; I didn't know anything about it.

"The Court: On the ground that it might tend to incriminate and degrade you?

"The Witness: Yes.

"Mr. Hupper: I do not wish to pursue that. It may well be that he did not know the first thing about it."

[6] The general rule, under the decisions in the federal courts, is that the master of a ship has no power to bind the owners of the ship by a false bill of lading. Schooner Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341; Bulkley v. Cotton Co., 24 How. 386, 16 L. Ed. 599; Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998; Missouri, etc., Co. v. McFadden, 154 U. S. 155, 14 S. Ct. 990, 38 L. Ed. 944. But it has been held in a number of the state courts that common carriers are estopped from denying their liability upon a false bill of lading given by the master or agent. Armour v. Michigan Central Railroad Co., 65 N. Y. 111, 22 Am. Rep. 603; Bank of Batavia v. New York, Lake Erie & Western R. Co., 106·N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440; Brooke v. R. Co., 108 Pa. 529, 1 A. 206, 56 Am. Rep. 235; Wichita Savings Bank v. Atchison, etc., Co., 20 Kan. 519; Sioux City, etc., Co. v. First National Bank, 10 Neb. 556, 7 N. W. 311, 35 Am. Rep. 488.

As to these bills which stated that the goods were on board in April, notwithstanding the fact that the ship did not arrive in New York until May, the District Judge held that they did not bind the ship. He said:

"As to the bills of lading containing the indorsement 'on board,' even if signed by the master, if in any case the goods were not actually on board at the date of the bill of lading, the same were signed in violation of law, and the master was without authority to bind the ship by such illegal action, except in so far as she might be liable to the penalty provided for the violation of that law. * * *"

The Act of August 29, 1916, otherwise known as the Pomerene Act (Comp. St. §§ 8604aaa–8604w), makes it unlawful to issue or procure the issue of a bill of lading which contains a false statement as to the receipt of the goods. This provision of the statute may be found in the margin.[2]

---

[2] "Sec. 41. That any person who, knowingly or with intent to defraud, falsely makes, alters, forges, counterfeits, prints or photographs any

The English Bills of Lading Act, 1855, 18 and 19 Vict. c. 111, contains an interesting provision on this subject. It may be found in the margin.[3] Under that statute it has been held that the owners not signing are not bound by it. Jessel v. Bath (1867) L. R. 2 Exch. 267. And it may be assumed that for a like reason the ship would not be bound. [7, 8] We are not now concerned to inquire whether any one had intent to defraud by issuing any of the bills of lading which were antedated. It is most probable that they had no such intent. The vessel had been long delayed in arriving at New York, and the parties found themselves very much embarrassed by the delay. It was the intention of all the parties to put the goods on board as soon as the ship arrived, and they were actually loaded on board when the ship reached New York. Nevertheless the bills of lading which were issued in April, and stated that the goods were then on board, were false. But we do not think that the Pomerene Act, which was enacted to prevent fraud, should be given a construction which would itself work fraud between shipper and shipowner. If a bill is antedated, and states that goods

have been placed on board, when they have not, and they are later loaded on the ship with the full knowledge and assent of the master, and are then actually transported to China or Japan, or to whatever may be the place of their destination, we do not doubt the ship's lien on the goods. We no more doubt the correlative lien of the shipper on the ship.

The District Judge, in arriving at a different conclusion, supports it by a decision made in the Southern District of New York in 1902 in The Isola Di Procida, 124 F. 942. That was a suit in rem to recover damages for the issuance of a false bill of lading, and the District Judge dismissed the libel, with costs. The bill of lading was dated at Girgenti, Sicily, on September 30, 1901, and it acknowledged the receipt upon the steamship of 800 tons of brimstone. No brimstone had been received on the ship on that date—the vessel being at that time at Marseilles. She did not arrive at Girgenti until October 12th when she took the 800 tons of brimstone on board. The ship arrived in New York on November 19, 1901. Between the time when the brimstone would have arrived in New York, if it had been shipped in September, and the time it actually arrived, there was a fall in the price of brimstone, and the libelant sued to recover the damage caused by such fall in price. The court thought the bill of lading did not bind the ship "so far as the incorrect date is concerned." The court in that case cited a number of decisions found in the margin.[4] Those cases assert the general rule that the master of a vessel has no power to bind the owners of the ship by a false bill of lading. Those cases lay down what is undoubted law—that if a master signs a bill of lading which is false, and the goods, at no time have been received on board, the ship is not bound. The bill of lading is void in such cases, even in the hands of a bona fide holder for value. In no one of the cases cited were the goods delivered to the carrier. They do not support, even with the authority of dicta, the proposition for which they were cited. And in Robinson v. Memphis, etc., R. Co. (C. C.) 16 F. 57, 60, the court said:

bill of lading purporting to represent goods received for shipment among the several states or with foreign nations, or with like intent utters or publishes as true and genuine any such falsely altered, forged, counterfeited, falsely printed or photographed bill of lading, knowing it to be falsely altered, forged, counterfeited, falsely printed or photographed, or aids in making, altering, forging, counterfeiting, printing or photographing, or uttering or publishing the same, or issues or aids in issuing or procuring the issue of, or negotiates or transfers for value a bill which contains a false statement as to the receipt of the goods, or as to any other matter, or who, with intent to defraud, violates, or fails to comply with, or aids in any violation of, or failure to comply with any provision of this Act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished for each offense by imprisonment not exceeding five years, or by a fine not exceeding $5,000, or both." Comp. St. § 8604u.

[3] "Every bill of lading in the hands of a consignee or indorsee for valuable consideration, representing goods to have been shipped on board a vessel, shall be conclusive evidence of such shipment as against the master or other person signing the same, notwithstanding that such goods, or some part thereof, may not have been so shipped, unless such holder of the bill of lading shall have had actual notice, at the time of receiving the same, that the goods had not been in fact laden on board; Provided that the master or other person so signing may exonerate himself in respect of such misrepresentation by showing that it was caused without any default on his part, and wholly by the fraud of the shipper or of the holder, or some person under whom the holder claims."

[4] "Schooner Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341; Bulkley v. Cotton Co., 24 How. 386, 16 L. Ed. 599; Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998; The Loon, 7 Blatchf. 244, Fed. Cas. No. 8499; Robinson v. Memphis, etc., Co. (C. C.) 9 F. 129; Id. (C. C.) 16 F. 57; American Sugar Refining Co. v. Maddock, 93 F. 980, 36 C. C. A. 42; Missouri, etc., Co. v. McFadden, 154 U. S. 155, 14 S. Ct. 990, 38 L. Ed. 944."

"Because the carrier is not bound by a bill of lading issued by an agent, unless the goods are on hand and delivered for shipment, it does not follow that the principal is not bound by the bill of lading if the goods be in fact subsequently delivered to be transported according to the terms of the contract. There is no element of illegality or any such vice in the contract that it is void or incapable of confirmation by acts of the parties taken for that purpose; and the old bill of lading is as good as a new one issued on delivery of the goods if the parties choose to make it so."

In The Idaho, 93 U. S. 575, 23 L. Ed. 978, decided in 1876, a bill of lading was signed before the goods were delivered to the ship. Later they were delivered to the ship and placed on board. The bill of lading was signed by the lawful master of the ship. The goods were shipped from New Orleans to Liverpool, England. A statute of Louisiana prohibited the issue of bills of lading before the receipt of the goods. A banking house in New Orleans in due course of business advanced a large sum of money upon this bill. In an opinion written by Mr. Justice Strong, for a unanimous court, it was said at pages 582, 583: ·

"It is not only the utterance of common honesty, but the declaration of judicial tribunals, that a delivery of goods to a ship corresponding in substance with a bill of lading given previously, if intended and received to meet the bill of lading, makes the bill operative from the time of such delivery. At that instant it becomes evidence of the ownership of the goods. Thus, in Rowley v. Bigelow, 12 Pick. [Mass.] 307 [23 Am. Dec. 607], it is said, a bill of lading operates by way of estoppel against the master, and also against the shipper and indorser. 'The bill acknowledges the goods to be on board before the bill of lading is signed. But if, through inadvertence or otherwise, the bill of lading is signed before the goods are on board, upon the faith and assurance that they are at hand, as if they are received on the wharf ready to be shipped, or in the shipper's own warehouse, * * * and afterwards they are placed on board, as and for the goods embraced in the bill of lading, as against the shipper and master the bill will operate on those goods by way of relation and estoppel.'

"Such is also the doctrine asserted in Halliday v. Hamilton, 11 Wall. 565 [20 L. Ed. 214], and it is in harmony with the general rules that regulate the transfer of personal property. We do not say that a title to personal property may not be created between

the issue of a bill of lading therefor and its delivery to the ship, which will prevail over the master's bill, but, in the absence of any such intervening right, a bill of lading does cover goods subsequently delivered and received to fill it, and will represent the ownership of the goods. The cotton delivered on the 8th of April on the pier for the Colson, and received by the mates of the brig, became, therefore, at the instant of its delivery, the property of Porter & Co., who were then the indorsees of the bills of lading. Its subsequent removal by Forbes to the Ladona, either with or without the consent of the brig's officers, could not divert that ownership.

"There is nothing in the statutes of Louisiana which requires a different conclusion. Those statutes prohibit the issue of bills of lading before the receipt of the goods, but they do not forbid curing an illegal bill by supplying goods, the receipt of which has been previously acknowledged. The statutes are designed to prevent fraud. They are not to be construed in aid of fraud, as they would be if held to make a delivery of goods to fill a fraudulent bill of lading inoperative for the purpose."

In the case at bar we must hold that the court below was in error in holding that the antedated bills of lading did not, under the circumstances herein disclosed, bind the ship. [9] The owners of a trading ship rarely navigate the ship themselves, but almost always intrust it to a master, and when they do so they are bound to the performance of every lawful contract made by him relative to the usual employment of the ship. Maclachlan's Law of Merchant Shipping (5th Ed.) 141. The master is the person to sign the bills of lading. He is the agent of the owners of the ship for that purpose; and contracts of affreightment entered into with the master in good faith and within the scope of his apparent authority, as master, bind the vessel to the merchandise for the performance of such contracts, wholly irrespective of the ownership of the vessel, and whether the master be the agent of the general or special owner. Schooner Freeman v. Buckingham, 18 How. 182, 189, 15 L. Ed. 341. He is the agent of the ship, and ordinarily binds it by the contracts he makes. In The Roanoke, 189 U. S. 185, 195, 23 S. Ct. 491, 493 (47 L. Ed. 770), Mr. Justice Brown, writing for the court, said:

"The master is the agent of the vessel and its owner in more than the ordinary sense. During the voyage he is in fact the alter ego of his principal. He is entrusted with an un-

controlled authority to provide for the crew, and for the preservation and repair of the ship. He engages the cargoes, receives the freight, hires and pays his crew, and is entrusted perhaps for years with the command and disposition of the vessel."

In Thompson on Bills of Lading, p. 29, it is laid down that, "where the shipper is not the charterer, the contract which is evidenced by the bills of lading is between the shipper and the shipowner, unless it can be shown, either by proving an express agreement or by inference from the fact that the person signing the bill of lading had no authority to do so on behalf of the shipowner, that the contract is between the shipper and the charterer." See Manchester Trust v. Furness, [1895] 2 Q. B. 539; Samuel v. West Hartlepool Steam Nav., [1906] 11 Com. Cas. 115; Marquand v. Banner, [1856] 6 E. & B. 232.

[10, 11] This brings us to the inquiry whether the bills of lading herein involved evidenced a contract between the shippers and the shipowner, and therefore the ship, or whether they show a contract between the shippers and the charterer. We are not at all concerned in this case with the lien which the shipowner or the ship has on the goods of the shippers. In this case, as the voyage was completely abandoned and the ship never broke ground, she had no lien on the goods, and none is being asserted on her behalf. Ex parte Nyholm, In re Child, [1873] 29 L. T. 634. But an action in rem lies for the breach of a contract of affreightment, where the goods have been actually delivered and received on board. That such is the established law is not controverted, or in any way questioned in this suit.

[12] The owner of a vessel is never liable as a carrier merely by virtue of his ownership. To make him so liable the vessel must have been in his employment, the party having the control of the vessel, and in whose business it is engaged, is regarded by the law as the owner pro hac vice, and as such is liable to the shipper. In this case, while the ship was under charter, the charter did not amount to a demise of the ship, but she was at all times in the possession of her owners.

In order to subject a vessel to process in rem, the goods must have been actually received on board or delivered to the master. The remedy in rem is founded on a maritime lien upon the thing proceeded against. Carver on Carriage by Sea (7th Ed.) § 692. And in this case all the goods for which bills of lading were issued were in fact received on board.

10 F.(2d)—61

[13] The master cannot bind the shipowner by signing bills of lading for goods that were never shipped at all. McLean v. Fleming, [1871] L. R. 2 Sc. App. 128; Brown v. Powell Duffryn Coal Co., [1875] L. R. 10 C. P. 562. Neither can he bind the ship by signing a second bill of lading for goods on board, for which he has already signed one bill. Hubersty v. Ward, [1853] 8 Ex. 330. But bills of lading signed by the master before the goods are on board operated on the goods as received as against the shipper and the master by way of relation and estoppel. The L. J. Farwell, 15 Fed. Cas. 707, No. 8,426.

[14] The serious question herein presented is whether certain bills of lading, which were issued, constituted a contract binding the ship, or only the charterer of the ship. A contract of affreightment, to bind the ship, must be executed by a person authorized to do so by the shipowner; and whether the bills of lading relied upon by the libelant had that effect must be determined.

The testimony shows that all "on board" bills were signed by the master. It also shows that no bills of lading were stamped "on board" unless the cargo was on board. But, assuming that the master has authority to sign the bills of lading, if the ship is under charter, does he bind the shipowner and the ship or merely the charterer? In Carver on Carriage by Sea (7th Ed.) § 153, the law is stated as follows:

"When the charterer does not ship the cargo himself, but procures a cargo to satisfy the charter party from other merchants, questions arise as to who is responsible to those shippers for the performance of the contracts of carriage made with them and who may enforce those contracts against them.

"The question is really one of fact, depending on the documents and circumstances of each case. If the charterer has himself, or by his agents, agreed with the shippers on his own behalf, he is answerable for the carriage of the goods accordingly. So with the shipowner, if he made them. But uncertainty arises when the contract has been made with the master, for he may possibly be regarded as agent either for owner or charterer.

"If the charter party is such as to give the charterer possession of the vessel, as well as the right to use her carrying capacity, so that the vessel is, in effect, let to him, and the master in charge of her is his servant, then the owner is not in the position of a carrier, either as regards the charterer or

anyone else, and there is no reason for regarding the master as actually, or presumptively, his agent in contracting with shippers."

Charter parties are sometimes a demise of the ship, but more frequently are mere contracts of carriage. Whether a charter amounts to a demise of the ship depends upon whether the owner has parted with the whole possession and control of the ship during the period of the charter party, so that without reference to the owner he may do what he pleases with regard to the captain, the crew and the management and employment of the ship. Sandeman v. Scurr, [1863] L. R. 2 Q. B. 86; Baumvoll v. Gilchrest, [1893] A. C. 8; Reed v. United States, 11 Wall. 591, 600, 20 L. Ed. 220; Leary v. United States, 14 Wall. 607, 610, 20 L. Ed. 756. "It is very rarely that a charter party does contain a demise of a ship." Herne Bay Co. v. Hutton, [1903] 2 K. B. 683, 689.

In Scrutton on Charter Parties (12th Ed.) art. 2, p. 5, it is said that "it may be that all that the charterer acquires by the charter is the right to have his goods conveyed by a particular vessel, and as subsidiary thereto, to have the use of the vessel and the services of the owner's master and crew. In this case, notwithstanding the temporary right of the charterer to have his goods loaded and conveyed in the vessel, the ownership and also the possession of the ship remain in the original owner, through the master and crew, who continue to be his servants."

"If the owner's master, by agreement of the owner and charterer, acquires authority to sign bills of lading on behalf of the latter, he nevertheless remains in all other respects the servant of the owner, *and such agreement may not free the owner from liability on bills of lading signed by the master.*"

In cases in which a charter is a demise, the owner is not liable to shippers, even if they do not know of the charter. Scrutton on Charter Parties (9th Ed.) p. 5, note.

[15] We come now to consider the charter herein involved. Under the charter the owners furnished the ship, the captain and crew, and agreed to pay and provide "for all provisions and wages, for insurance of the steamer, for all deck and engine room stores, and maintain her in a thoroughly efficient state in hull and machinery during service." The charterer employed the stevedore, and had authority to appoint a supercargo. The charter provided:

"Captain to prosecute all voyages with utmost dispatch and to render customary assistance with ship's crew. Captain to be under the orders of charterers as regards employment, agency, or other arrangements. Charterers to indemnify owners against all consequences or liabilities arising from captain, officers, or agents signing bills of lading or other documents or otherwise complying with such orders, as well as from any irregularity in steamer's paper or for over-carrying goods. Owners not to be responsible for shortage, mixture, marks, nor for number of pieces or packages, nor for damage to or claims on cargo caused by bad stowage or otherwise, the stevedore being employed by the charterers."

It is evident that, as between the owner and the charterers, the captain was acting as the agent of the charterers, and was subject to their orders. It further provided that:

"The whole reach and burthen of steamer, including lawful deck-capacity to be at charterers' disposal, reserving proper and sufficient space for steamer's captain, officers, crew, tackle, apparel, furniture, provisions, and stores."

It further provided:

"If charterers have reason to be dissatisfied with the conduct of captain, officers, or engineers, owners, on receiving particulars of the complaint to promptly investigate same, and, if necessary and practicable, make a change in the appointments."

It is certain that the charter party was not a demise. The captain, officers, and crew were not appointed by the charterers, but named by the owners, and through them the owners were in possession of the vessel and responsible for her navigation. Moreover, the fact is that the ship did not appear in the advertisements as a chartered vessel, and it is not shown that the shippers who dealt directly with the Fulton Steamship Corporation had any notice that the ship was a chartered vessel.

In Belcher v. Capper, 11 L. J. C. P. 274, 4 Man. & G. 502, the charterer had the right to put in a master of his own appointment and to pay his wages, the owners allowing whatever rate of wages they paid their own masters, and the owners were not to be responsible for his acts and conduct. It was held that the possession of the vessel was given up by the owners to the charterer during the continuance of the contract, and that the master was in possession of the cargo as agent for the charterer, and not as the servant of the owners; that personal credit was given to the charterer for the payment of the hire of the vessel, and that the shipowner had no lien on the goods.

In Omoa & Cleland Coal & Iron Co. v.

Huntley, 2 C. P. D. 464, [1877], the ship was let for six months with a full complement of officers, seamen, engineers, and firemen, and was placed under the direction of the charterer. The captain was to sign bills of lading and follow the charterers' instructions "as regards loading, discharging, and departure." In the course of a voyage under this contract, the vessel was wrecked, owing to the negligence of the master and crew. It was held that the owner was liable to the charterers for that negligence, inasmuch as by the charter party it was intended that, so far as it concerned the navigation of the vessel, the owner was to retain her under his control for the purpose of carrying out his contract. The charterers might direct where the ship was to go, and with what she was to be laden, but the owner was in all respects accountable for the manner in which she might be navigated.

Under the charter in this case the owners appointed the master and officers and hired the crew, and the charterers had no power to displace them, and it is not suggested that the ship was in the possession of the charterers. She was, during the whole period involved, in the possession of her owners, and consequently the master bound the ship, and not the charterers merely in all the bills of lading which he lawfully signed.

As between the shipowner and the charterer, the master, in signing bills of lading, acted as the agent of the charterer, but as between the shipowner and the shipper he was the agent of the owner, who appointed and paid him, and who, in not allowing the ship to start on the voyage from New York, obeyed the orders given him by the owner whose agent he continued to be.

[16] In every contract of affreightment, whether by charter party or bill of lading, the ship is by the admiralty law hypothecated to the shipper for any damage sustained by his goods through the failure of the ship to transport them in safety to their destination—the injuries not being occasioned by the excepted perils. In 36 Cyc. 70, it is said:

"The shipper under an ordinary bill of lading has his remedy against the ship, whether the charter is one where the owner retains possession and command, or whether the control and navigation pass to the charterer; but whether the owner or the charterer is ultimately liable depends on the terms of the charter party. It is immaterial, however, to the question of liability, whether the owner receives for the use of the vessel a stipulated sum or a share of its earnings. In either case the party who by the contract with the owner is entitled to the possession and command of the vessel is liable for not delivering goods. If the charterer is owner pro hac vice, he alone is personally liable for injury to or nondelivery of the cargo, unless the owner has by his conduct induced a reasonable belief in the shipper that the vessel was to sail on his account, and under his direction and control." See Richardson v. Winsor, 20 Fed. Cas. 726, No. 11,795, 3 Cliff. 395; The T. A. Goddard (D. C.) 12 F. 174.

The only question we are concerned with in this case is that of the liability of the ship. The suit is in rem against the ship, and is not in personam against either the shipowner, or the charterer, or the ultimate liability of either. In Schooner Freeman v. Buckingham, 18 How. 182, 189 (15 L. Ed. 341), Mr. Justice Curtis, writing for the court, said:

"We are of opinion that, under our admiralty law, contracts of affreightment, entered into with the master, in good faith, and within the scope of his apparent authority as master, bind the vessel to the merchandise for the performance of such contracts, wholly irrespective of the ownership of the vessel, and whether the master be the agent of the general or the special owner."

And we are not aware that the Supreme Court in any subsequent case has ever expressed a contrary opinion.

In The Alert, 61 F. 113, 9 C. C. A. 390, this court held that, even in the case of a demise of the ship, the vessel is not freed from liability on contracts of affreightment received from the agent of the ship.

In Field Line v. South Atlantic S. S. Line, 201 F. 301, 304, 119 C. C. A. 539, 542, the charter party provided that the captain should sign the bills of lading when presented to him. It was held that there was no demise of the vessel, the master and crew remaining in possession. The Circuit Court of Appeals in the Fifth Circuit said:

"The charter party permitting the master and crew to remain in control of the vessel, the master continued to be the representative of the shipowner; and the meaning of the stipulation that the master shall sign the bills of lading is that the shipowner shall, through the master, contract with shippers for the charterer's benefit. It would seem to follow that the shipowner in such cases is bound by the bill of lading, although it may in terms differ from the charter party."

In The Coventina (D. C.) 52 F. 156, a controversy arose between the shipowner and the charterer, which led to an unreasonable delay in the sailing of the vessel. The shipper, who held the bills of lading issued by

the master of the ship, sought to hold the ship liable for the loss he incurred by the delay. Judge Addison Brown held the ship liable with right of recourse for indemnity over to the person causing it. Referring to the controversy which had arisen between the charterer and the shipowner, Judge Brown said:

"The shipper was a stranger to that controversy. Its consequences were not at the shipper's risk, but at the risk of the owners, who had voluntarily dealt with the charterers and had chosen to obtain cargo in that way. If the charterers were in the wrong, the owners were entitled to indemnity from them; and the court of appeal, as above stated, seems to have awarded that indemnity."

The English rule is different. It is not that a bill of lading signed by a master binds the shipowner, although the ship is under a charter which is not a demise, and that the master is regarded as having made it on the owner's behalf, and not on behalf of the charterer. The English cases are reviewed in Carver's Carriage by Sea (7th Ed.) secs. 154–157. At page 242 Carver states "In effect, then the contract is in general with the shipowner; and the master should be regarded as having made it on his behalf, and not on behalf of the charterer. And this is the more consistent view; for, if the master is agent for the charterer in giving the bills of lading, his agency ceases at that point; in carrying out the contract, he clearly acts as servant of the owner."

[17, 18] It is claimed by the steamship, and by her owner, that neither is liable on the freight contracts, and that whatever liability exists is that of the Fulton Steamship Corporation. This seems to be based on two considerations:

First, because the dock receipts stated that "The Fulton Steamship Corporation shall not become responsible for the goods as carrier until the goods are actually loaded on the steamer."

Second. That while bills of lading were signed, "Fulton Steamship Corporation, Agents for Master," there is no proof of any authority given to that corporation by the master to sign bills of lading on his behalf, and the charter did not expressly provide that the master should sign bills of lading. But that it was clearly understood that he should do so is shown by the statement made in the charter that the charterers indemnified the owners against all liabilities arising from his signing bills of lading.

We shall consider these propositions in their reverse order. Let it be admitted, as it must be, that there is no proof that the Fulton Steamship Corporation was ever authorized to sign bills of lading on behalf of the master. What the testimony shows is that all "on board" bills were in fact signed by the master, and that no bills were stamped "on board" unless the cargo was actually on board.

It is admitted that the bills of lading issued prior to the arrival of the steamship and signed "Fulton Steamship Corporation, Agents for Master" were so signed without authority from the master. But after the arrival of the ship at New York these bills of lading were presented to the master, who was told what had been done. He expressed his full approval, and then affixed his own signature to them. The testimony establishing that fact has been hereinbefore set forth.

The law is elementary that, where one assumes to act as agent, but does so without previous authority, the principal has the right either to repudiate or to ratify the unauthorized transaction. If he ratifies, he accepts the contract which the agent made, and it becomes binding and takes effect as of the date when the agent made it. It is a confirmation of the original contract; and the general rule is that any person can ratify an unauthorized act of another on his behalf if at the time of ratification he himself had the power to do the act which he ratifies. And as a valid ratification is equivalent to prior authority, it relieves the agent from any liability to third persons for acting without authority, provided the third person is not by ratification placed in a worse position than he would have been in, had the agent acted under prior authority.

The ratification of an unauthorized act is equivalent to a prior authority to perform it. As Mr. Justice Story said in Fleckner v. Bank of the United States, 8 Wheat. 338, 5 L. Ed. 631: "No maxim is better settled, in reason and law, than the maxim 'omnis ratihabitio retrotrahitur et mandato priori equiparatur'; at all events, when it does not prejudice the rights of strangers." And in Cook v. Tullis, 18 Wall. 332, 21 L. Ed. 933, Mr. Justice Field declared that "the ratification operates upon the act ratified precisely as though authority to do the act had been previously given, except where the rights of third parties have intervened between the act and the ratification."

We confess ourselves entirely at a loss to understand why it should be supposed to make any difference whether the Fulton

Steamship Corporation signed the bills of lading without authority as "Agents for Master," when the master afterwards, approving and confirming what had been done, affixed his own signature to the bills with full knowledge of all the facts. This was ratification, and it related back to the time when the unauthorized act was done, and made it as effective as though it had been originally authorized. "Omnis ratihabitio retrotrahitur et mandato priori equiparatur."

[19, 20] Before concluding that part of this opinion relating to the subject of the ratification of the bills of lading, it is necessary to refer to the antedated bills, issued in April, which were then delivered to the shippers, and which we have discussed previously in another connection. As these bills were delivered prior to the arrival of the ship, they were not in the possession of the Steamship Corporation upon the arrival of the ship, and so were not presented to and signed by the master at the time he signed the other bills. But the testimony hereinbefore set forth shows that his attention was specifically called to them and that he said that it was "all right." He thereby ratified all such bills as effectually as though he had himself placed his signature upon them. No particular formality is ordinarily necessary to enable a principal to ratify the unauthorized acts of one who has assumed to act as his agent. The general rule is that, except in cases where ratification in writing is required by a sealed instrument, or where ratification in writing is required because some statute makes a writing necessary, ratification need not be in writing, and may be by parol. Mechem on Agency (2d Ed.) vol. 1, § 428.

And what has been said as to the bills of lading signed in April, and not signed by the master, applies equally to the few bills signed by the Fulton Steamship Corporation as agent after the arrival of the ship, and which were not signed by the master. The testimony set forth herein, and which is uncontradicted, shows that, when the master was informed that the Steamship Corporation might sign bills notwithstanding the ship had arrived, he waved his hand and said, "It is all right; go ahead and do so." This was all that was required, and as in all cases the goods were placed on board the ship, all the bills of lading involved must be held valid and binding on the ship.

[21] In the testimony previously set forth there appears a letter, dated May 5th and signed by the master, in which he refers to bill of lading No. 22, and states that he authorized the Fulton Steamship Corporation, by J. H. Everson, to sign "for and in my behalf as agent for the owners and charterers" of the ship the bill mentioned. The District Judge very properly held this was a ratification and bound the ship. In Armour & Co. v. Ft. Morgan S. S. Co., Limited (C. C. A.) 297 F. 813, a cattle company had chartered a vessel with a full complement of officers, seamen, engineers, and firemen for the transportation of cattle from a port in Costa Rica to Jacksonville, Fla. The charterer libeled the steamship, claiming it was liable for the death and injury of some of the cattle, and attributed it to the alleged unseaworthy condition of the vessel when it started on the voyage. The basis of the claim against the vessel was the bill of lading. It was signed "The Central American Cattle Co., Inc., by Tho. Johannesen, Master S. S. Ft. Morgan." The Circuit Court of Appeals for the Fifth Circuit, affirming the court below, held that the shipper could not hold the ship or its owner, but only the charterer, as the shipper's contract for the carriage of the cattle was with the charterer, the Cattle Company, alone. "Nothing in the terms of the charter party indicates that it was contemplated that the ship or its owner could be made liable for a breach of a contract of affreightment made by a shipper with the charterer."

That case is plainly distinguishable from the case at bar. In the Armour Case the bill of lading was signed by the master as the agent of the Central American Cattle Company. In the case at bar the Fulton Steamship Corporation signed the bills of lading as "agents for the master." If it did this without authority, it would have made itself liable, if it were not for the fact that the master subsequently ratified its unauthorized act. In the Armour Case the form of the master's signature indicated the absence of intention to bind any one but the charterer; but in this case the master's signature is not limited but is unrestricted and bound the ship.

[22] As respects the defense urged at the argument, and hereinbefore mentioned, that the steamship is not liable because of the language of the dock receipts, in which it was stated that "the Fulton Steamship Corporation shall not become responsible for the goods as carrier until the goods are actually loaded on the steamer," little need be said. This is a suit against the ship. It cannot be defeated by showing that a suit might or might not have been brought against the

charterer in personam. It cannot be defeated by showing that some one else was or was not liable. The suit is brought against the ship, and it is based solely on the bills of lading, and neither the libels nor the answers make any reference to the dock receipts.

[23] The District Judge in his opinion attached importance to the fact that the ship never broke ground. He said:

"As to all cargo not covered by legal original bills of lading, or the letter signed by the master, the ship was not bound to carry the same on the default of the charterer in payment of the charter hire. The Esrom, supra [C. C. A.] 272 F. 266; The Devona [D. C.] 272 F. 275. Had the ship broken ground and commenced the voyage a different rule would be applied, and the ship would have been obliged to carry the cargo to a port stated in the bill of lading."

In this we think he fell into serious error. The Esrom Case (C. C. A.) 272 F. 266, certainly affords no authority for the proposition which he lays down. In that case each of the three judges wrote a separate opinion. In not one of them is there to be found the doctrine that the liability of the ship to the shipper for goods actually received on board is contingent on the ship's actually breaking ground in a case in which the bills of lading were signed by the master. Judge Manton, who wrote for the majority of the judges, expressly declared that "the lien of the vessel upon the goods and of the goods upon the vessel attaches from the moment the goods are laden on board, and not from the time only when the ship breaks ground." And in support of that proposition he cited several decisions of the Supreme Court in which the same identical proposition is stated, and also the decision of this court in National Steam Navigation Co., Limited, v. International Paper Co., 241 F. 862, 154 C. C. A. 565, in which this court said: "The obligation of the ship to carry, and of the shipper to pay for the carriage, accrues when the goods are delivered to the ship."

Judge Hough, in a separate opinion, stated that he substantially agreed with the opinion written for the court by Judge Manton. He then went on to say: "There did exist between shipper and the personified ship mutual obligations dependent wholly upon that union of ship and goods arising from the lading of the former on the latter, lately discussed at some length in The Saturnus, 250 F. 407, 162 C. C. A. 477, 3 A. L. R. 1187." And the reason for his concurrence is really stated in the concluding statement of his opinion, which follows: "In the absence of that contract with the owners usually evidenced by a master's bill, this libelant was entitled to look to the personified ship for proper stowage, seamanlike management, and right delivery; but he can look to charterers only for the date of sailing. As he knew of the chartered relation, he is presumed to know that charterers direct the movements of the ships they hire; all ships are chartered for that purpose." The statement quoted shows that though the ship had not sailed, and the master had not signed the bills of lading, the libelant was entitled to look to the ship for "right delivery."

In the Esrom Case a libel was filed against the ship to recover damages caused to cases of prunes. The ship was under charter, and the bills of lading were not signed by the master of the ship, but by the charterer, and it was held by Judges Hough and Manton that, as the charter bound the ship not to sail until she had a full cargo, the ship was not liable to the shipper for damage to the prunes due to delay in sailing while waiting for a full cargo. Judge Ward dissented, and held the ship bound, notwithstanding the master had not signed the bills of lading for this particular shipment. He said:

"As the master had signed some of these bills of lading, knowledge of their contents is imputable to the owners. How can it be said that the owners, knowing that cargo belonging to various shippers was going aboard their steamer under bills of lading signed by the charterers, as agents for the steamship, did not make the charterers their agents for that purpose? The bill of lading, if signed by the master, would have bound the ship; and if the charterers signed it as the agent of the owners of the ship, with their consent, express or implied, it has exactly the same effect. Whether the master or the charterers signed the bill of lading was a mere technicality as Lord Chancellor Loreburn said in Owners of Steamer Knutsford v. E. Tillmans & Co., [1908] A. C. 406: 'The other point —namely, that one of the bills of lading was signed by Messrs. Watts, instead of by the captain—to my mind is destitute of validity in law, and even more destitute in merits. If the captain had been directed to sign it, he was obliged to sign it. The point is a merely technical point, that the proper signature was not there. As a matter of fact, I should be very sorry to lay down any rule that under such a contract the charterer or shipowner could always sign; but I am not satisfied that the captain did not know perfectly well of this signature and sanction it. I think that

there is absolutely nothing in that point also.'"

It is true that Judge Manton, in his opinion, did refer to the subject of the ship's "breaking ground." After stating that the lien of the goods upon the vessel attaches "from the moment the goods are laden on board," he later in his opinion said:

"The obligations which are created one to the other, then, are that the ship is bound not to injure the merchandise by improper stowage or rough handling, and, if she does, then there will be a liability in rem, even before the voyage is begun. If the voyage is begun, the vessel must carry the goods to destination on the terms agreed by the shipper with the charterer; for when the vessel starts upon the voyage, by implication, there is a ratification and adoption by the ship of the charterer's contract with the shipper. Then the shipper is deprived of an opportunity to retake his goods, and the goods are in the sole possession and control of the ship. So, too, the ship is then bound by the charterer's bill of lading, under which the freight is prepaid, and cannot collect further freight at destination. The Ada (D. C.) 233 F. 325. Before sailing, the vessel owner is protected by his opportunity to refuse to carry the goods on the terms agreed by the charterer before the voyage is commenced."

What he had in mind in the statement above quoted was not a bill of lading signed by the master, which bound the ship, but one signed by the charterer, and which he thought did not bind the ship unless the ship started upon the voyage. If and when it so started, it was the opinion that it would work a ratification and adoption by the ship of the charterer's contract with the shipper. What he said on that subject was purely obiter dicta, as before the ship sailed the prunes had been unloaded upon the demand of the shippers, because of the long delay in the sailing of the vessel, and it was the expression of his own opinion only. The substantial concurrence of Judge Hough is not to be understood as an approval of a matter which was not before the court, and especially in view of Judge Hough's own statement, already quoted, that notwithstanding the absence of a master's bill of lading the libelant was "entitled to look to the ship for right delivery."

In saying what we have in reference to that portion of Judge Manton's opinion relating to the ratification of the charterer's bill of lading by the ship's breaking ground with the goods on board, we do not wish to be understood as expressing any opinion either favorable or unfavorable thereto. That question simply was not in this case, and it was not in the Esrom Case.

The District Judge also cited in support of his conclusion The Devona, 272 F. 275. That was a decision in the District Court for the Eastern District of New York. It is enough, perhaps, to say that the single question decided in that case was whether a ship was liable for freight prepaid to the charterers, where the goods had been put on the ship and taken off before the ship sailed by direction of the captain; the money having been paid to the charterer's agent, the money never having been paid over to the shipowner who had never authorized the charterer's agent to receive moneys in its behalf.

In Scott v. The Ira Chaffee (D. C.) 2 F. 401, Judge Brown (afterwards Justice Brown of the Supreme Court) held that the owner of a cargo has no lien upon the vessel for a breach of a contract of affreightment until the cargo, or some portion of it has been laden on board or delivered to the master. And in The Monte A, 12 F. 331, Judge Addison Brown, in the Southern District of New York, asserted the same doctrine. And this court in The Saturnus, 250 F. 407, 162 C. C. A. 477, 3 A. L. R. 1187, held that a breach of an affreightment contract supports a proceeding in rem if and as soon as goods are laden on board. And this we understand to be the doctrine of the Supreme Court. The Freeman, 18 How. 182, 15 L. Ed. 341; The Yankee Blade (Vandewater v. Mills), 19 How. 82, 15 L. Ed. 554; The Keokuk, 9 Wall. 517, 519, 19 L. Ed. 744. In Osaka Shosen Kaisha v. Lumber Co., 260 U. S. 490, 499, 43 S. Ct. 172, 174 (67 L. Ed. 364), the court declared that "The contract of affreightment itself creates no lien, and this court has consistently declared that the obligation between ship and cargo is mutual and reciprocal, and does not attach until the cargo is on board or in the master's custody. We think the lien created by the law must be mutual and reciprocal; the lien of the cargo owner upon the ship is limited by the corresponding and reciprocal rights of the shipowner upon the cargo."

In National Steam Navigation Co. v. International Paper Co., 241 F. 861, 863, 154 C. C. A. 563, 565, this court said, through Judge Ward: "The obligation of the ship to carry, and the shipper to pay for the carriage, accrues when the goods are delivered to the ship." And in The Saturnus, 250 F. 407, 162 C. C. A. 477, 3 A. L. R. 1187, this court, in a learned opinion by Judge Hough, decided that for breach of a contract of affreightment by the ship prior to the delivery

of the goods to the ship there is no lien on the ship for resulting damages.

In The Bird of Paradise, 5 Wall. 545, 563 (18 L. Ed. 662), Mr. Justice Clifford, writing for the Supreme Court said: "That the lien for freight commences as soon as the goods are delivered into the control of the master, or certainly as soon as they are put on board."

In Bulkley v. Naumkeag Steam Cotton Co., 24 How. 386, 16 L. Ed. 599, it was laid down that the lien of the shipper attaches when the goods are delivered to the master or his agent to be transported by the ship. The court said: "There is no necessary physical connection between the cargo and the ship, as a foundation upon which to rest this liability" (the shipper's lien).

The rule is stated as follows: "The shipowner becomes responsible as a carrier for all goods which have been delivered to him, or to his authorized servants, for the purpose of being carried. It is not necessary that they should have actually got on board. Thus, delivery to the mate on the quay, alongside of which the vessel is lying, is sufficient." Carver on Carriage by Sea (5th Ed.) § 68, p. 88.

After the goods are delivered into the custody of the master and are received on board, the failure of the ship to break ground may defeat the ship's lien for freight, but it does not defeat the shipper's lien for the safe transportation of his goods. In The Tornado, 108 U. S. 342, 2 S. Ct. 746, 27 L. Ed. 747, a contract of affreightment was made for the transportation of bales of cotton from New Orleans to Liverpool, and 5,008 had been put on board the ship, 164 were on the levee, and 23 had not reached the levee. While the ship was moored at the wharf, and before she had broken ground for the voyage, she was found to be on fire. Water was pumped into her, but she filled with water and sank to the bottom of the river. While she was still in that condition she was libeled. The court held that on this state of facts the contract of affreightment was thereby dissolved; that the ship had no claim to freight money, the principle being that, if a ship does not begin her voyage at all, does not break ground, no freight can be payable. The case was decided on the rule that, where the stipulations of a contract are interdependent, a defendant cannot be sued for the nonperformance of stipulations on his part which were dependent on conditions which the plaintiff has not performed. Mr. Justice Blatchford, speaking for the court, said:

"The shipowner was entitled to freight only for carrying the cargo and delivering it at Liverpool, with the implied covenant that this particular vessel was to take it on board and enter on the voyage. Before that event occurred this vessel was substantially put out of existence by no fault of the shipper, and he had and could have no benefit from the contract. He had a right, therefore, to treat the contract as rescinded, so far as any liability for freight was concerned."

In the case at bar the ship, while loaded with the goods, never broke ground and started on her voyage to the Far East, although physically capable of doing it, under the charter, which as we have seen, she had the right to withdraw from the service of the charterers, because of the default in making payment on May 9th. But this case is distinguishable from the case of The Tornado. That case arose between the parties to the charter. In this case the libelants are not parties to the charter, but the question is as to the liability of the ship to the shippers on the bills of lading which constitute the contract between the ship and the shippers, and the only default under the contract is that of the ship itself. The default of the charterer released the shipowner on its contract with the charterer, but it did not release the ship from the contracts made by the master with the shippers when he signed the bills of lading.

[24, 25] This brings us to the question of damages. The District Judge held that the amount of the damages due to the loss of market should be measured by the difference between the market value of the goods at the time the ship should have arrived at her respective unloading ports in China and Japan, had she sailed after completing her loading, and the time when she ought to have sailed, and the market value of the same goods in New York when they were delivered back to the shippers. This, in our opinion, was error. The market value in New York at the time the goods were returned to the shippers would have been material, if the goods had not been forwarded to their destination by other vessels.

The value of the goods at the port of shipment is only to be taken into consideration in case the goods could not be forwarded to the port of their destination either because they could not have been disposed of on their arrival there because of want of markets, or because there was a lack of other means of transportation.

In the case at bar, no such difficulties existed and the shippers actually forwarded

their goods to their destination and received therefor the prices at that time prevailing. It was the duty of the shippers to mitigate the damages as much as possible, and this they undertook to do by sending the goods forward by other means. It does not appear in this record what the difference is in the price actually received on the arrival of the goods so forwarded, and the amount which would have been received had the goods gone forward on the Capitaine Faure, had she actually made the voyage as contemplated.

In The Oregon, 55 F. 666, 673, 5 C. C. A. 229, 235, decided in the Circuit Court of Appeals for the Sixth Circuit in 1893, Chief Justice Taft, then Circuit Judge, writing for the court, said: "But it is a general rule that it is the duty of one party to a contract which has been broken by the other to use reasonable diligence to reduce the damages arising from the breach. If, therefore, in cases of freight contracts, the carrier refuses to perform, it is the duty of the shipper, if he can reasonably expect thereby to reduce his loss, to seek other means of transportation, and perform the contract himself."

The court also said: "Where one contracts with a carrier to transport ordinary merchandise, having a market value, from one point to another, the profit which both he and the carrier may reasonably expect him to make out of the transaction is the difference between the market value of the merchandise at the point of destination and the market value at the point of shipment, less the freight under the contract. The pecuniary difference between the shipper's condition with the contract performed and his condition if the merchandise is not shipped, but remains at the point of shipment, is this profit, which is therefore his legal damage."

And as to the measure of damages in this class of cases, see Dillenback v. The Rossend (D. C.) 30 F. 462; Farmers' Loan & Trust Co. v. Northern Pacific Railroad Co., 120 F. 873, 880, 57 C. C. A. 533, affirmed 195 U. S. 439, 25 S. Ct. 84, 49 L. Ed. 269; Luckenbach v. Grace (C. C. A.) 267 F. 676, certiorari denied 254 U. S. 644, 41 S. Ct. 14, 65 L. Ed. 454; The Tampico (C. C. A.) 286 F. 482, 486; Grace & Co. v. Luckenbach S. S. Co., Inc. (D. C.) 258 F. 49.

The libelants are entitled to a recovery against the steamship upon all the bills of lading issued to them or to their assignors, for cargo received on board the respondent Capitaine Faure, and the amount of the damages for the breach of contract should be such compensation as will restore the libelants to the same pecuniary condition they would have been in had the contract been performed.

In the case of the goods which were reshipped the amount of damages is the difference between the market value at destination, at the time they would have arrived in ordinary course on the Capitaine Faure, and the market value at destination at the time the goods were actually received at the designated port in ordinary course, plus the freight and the other necessary expenses incurred in connection with such reshipment.

In the several instances where cargo was not reshipped the measure of damage is the difference between the market value of the goods at the time the ship should have arrived at the ports of destination, if she had sailed after completing her loading, and the market value of the same goods at the ports of destination upon the arrival of the next available vessel.

The interlocutory decree must be modified accordingly. It is so ordered.